The United States, Appellants, *v.* Baptiste Guillem, Claimant of One Box of Specie.

A neutral leaving a belligerent country, in which he was domiciled at the commencement of the war, is entitled to the rights of a neutral in his person and property, as soon as he sails from the hostile port.

The property he takes with him is not liable to condemnation for a breach of blockade by the vessel in which he embarks, when entering or departing from the port, unless he knew of the intention of the vessel to break it in going out.

This was an appeal from the decree of the Circuit Court of the United States for the District of Louisiana, sitting as a prize court.

Baptiste Guillem, a French citizen, was domiciled in Mexico, and had resided there about three years before the war with the United States was declared. His occupation was that of cook in a hotel, and he was engaged in it in Vera Cruz when hostilities with this country commenced. He was not naturalized and had taken no steps to become a citizen of Mexico. He continued in Vera Cruz, pursuing his ordinary business, until he learned that an attack was about to be made on the city, by sea and land, by the forces of the United States. He immediately prepared to leave the country and return to France, with his family, carrying with him all the money he had saved. He intended to embark in the British steamer, which was expected to arrive at Vera Cruz early in March, 1847, and obtained a passport from the French consul for that purpose. But the steamship was wrecked on the island of Cuba, and did not reach Vera Cruz, and Guillem was still in that city when General Scott landed and closely besieged it.

The port of Vera Cruz had been blockaded by the naval

forces of the United States from the commencement of the war. When the land forces arrived, and the siege was about to commence, General Scott and Commodore Perry (who commanded the blockading squadron) agreed to leave the blockade open to the consuls and other neutrals, to pass out to their respective ships of war, until the 22d of March, after which all communication with the besieged city was interdicted.

On the 13th of March, a French vessel called La Jeune Nelly came into the port, having run the blockade. She came in. in the daytime, with her colors flying, nor is there any evidence in the record to show that it was known in Vera Cruz that she had come into port without permission from the blockading ships. She sailed again on the 19th of March, bound for Havre, in open day, and without manifesting any desire for concealment, but yet in breach of the blockade. But there was no evidence that Guillem knew she came in or was sailing out in breach of the blockade. Guillem took passage on board of this vessel with his family, and took with him in gold and silver two thousand eight hundred and sixty dollars, — the whole amount of his three years' earnings in Mexico. The Jeune Nelly had no cargo and sailed in ballast. The money of Guillem was not shipped as cargo, nor invoiced, but was taken with him as a part of his personal effects. The money was chiefly in two bags, which were kept in his state-room, but a part of it was in a belt about his person.

The Jeune Nelly was captured by the blockading squadron a few hours after she sailed; and on the night following was wrecked and totally lost on one of the islands near the port; but the passengers, crew, and all the money and property on board, were saved. The passengers and crew were immediately released, and the money of Guillem and other property on board were taken possession of by the orders of Commodore Perry, and sent to New Orleans for adjudication. It was libelled in the District Court, and condemned, as lawfully seized. Guillem appealed from this decree to the Circuit Court, where it was reversed, and the money in question directed to be restored and refunded to him. The captors appealed from this last-mentioned decree to the Supreme Court.

It was argued by *Mr. Crittenden* (Attorney-General), for the appellants, and *Mr. Soulé,* for the claimant.

*Mr. Crittenden,* for the appellants.

As it has been set up and insisted on that Guillem, in embarking on board the Jeune Nelly, acted under permission of General Scott, it is necessary to ascertain what actually took

place at the time at Vera Cruz. The correspondence of General Scott,.as to the operations of the army before Vera Cruz, will be found annexed to President Polk's message to Congress of December, 1847, in 1 Senate Documents, p. 216, *et seq.* From this correspondence it appears that the landing of the troops was effected on the 9th of March, and that on the 13th, in answer to a request of the French and Spanish consuls that in his operations he might respect the persons and property of French and Spanish subjects, he communicated to them, that in carrying the city, whether by bombardment or assault, it would be exceedingly difficult, particularly in the night-time, for his forces to see the consular flags, or to discriminate between the persons and property of friends and the persons and property of the enemy; he could, therefore, only promise to do all that circumstances might possibly permit to cause such discrimination to be observed. He also sent them safeguards under his signature. (p. 219.) By a letter of his to Commodore Perry, of the 22d, it appears that up to that time intercourse had been allowed between the neutral vessels of war and the city and castle of Vera Cruz, but was then put an end to. (p. 228.) And a communication to that effect was made by Commodore Perry to the commanders of the neutral ships of war. (p. 228.) It was not until the 24th that the British, French, Spanish, and Prussian consuls addressed General Scott, praying him to suspend hostilities, and to grant a truce, to enable their countrymen to leave the place with their women and children. (p. 229.) In a despatch to the Secretary of War, under date of the 25th, General Scott says: — "All the batteries, Nos. 1, 2, 3, 4, and 5, are in awful activity this morning. The effect is no doubt very great, and I think the city cannot hold out beyond to-day. To-morrow morning many of the new mortars will be in a position to add their fire, when, or after the delay of some twelve hours, if no proposition to surrender should be received, I shall organize parties for carrying the city by assault. So far, the defence has been spirited and obstinate.

"I inclose a copy of a memorial received last night, signed by the consuls of Great Britain, France, Spain, and Prussia, within Vera Cruz, asking me to grant a truce to enable the neutrals, together with Mexican women and children, to withdraw from the scene of havoc about them. I shall reply, the moment that an opportunity may be taken, to say, — 1st. That a truce can only be granted on the application of Governor Morales, with a view to a surrender. 2d. That in sending safeguards to the different consuls, beginning as far back as the 13th instant, I distinctly admonished them, particularly the

French and Spanish consuls, and of course through the two the other consuls, of the dangers that have followed. 3d. That although at that date I had already refused to allow any person whatever to pass the line of investment either way, yet the blockade had been left open to the consuls and other neutrals, to pass out to their respective ships of war, up to the 22d instant. And, 4th. I shall inclose to the memorialists a copy of my summons to the governor, to show that I had fully considered the hardships and distresses of the place, including those of women and children, before one gun had been fired in that direction. The intercourse between the neutral ships of war and the city was stopped at the last-mentioned date, with my concurrence, which I placed on the ground that that intercourse could not fail to give to the enemy moral aid and comfort." (pp. 225, 226.)

General Scott accordingly, on the same day, addressed a communication to the consuls of the nature above indicated, in which he says that he deeply regrets the lateness of their application, for up to the 22d instant the communication between the neutrals in Vera Cruz and the neutral ships of war lying off Sacrificio was left open, mainly to allow those neutrals an opportunity to escape from the horrors of the impending siege, of which he gave to the consuls every admonition in his power. (pp. 230, 231.) This communication was made known to the Mexican general, and led to the capitulation.

From the preceding narrative it appears that the only permission to neutrals given by General Scott or Commodore Perry, was to pass from Vera Cruz to the ships of war of their respective nations.

No treaty stipulations between the United States and France, on the subject of blockade, were in existence at the date of these occurrences. There was a convention made between them on the subject, in 1800, but which was to last only eight years. After the expiration of that time, it does not seem to have been renewed.

The cause is now to be heard in the Supreme Court, on an appeal taken by the United States from so much of the decree of the Circuit Court as is in favor of Guillem for the amount claimed by him.

There can be no question that the Jeune Nelly was liable to capture for breach of the blockade, and such was the answer of our own government to that of France, when it made reclamation on behalf of the owner for the value of the vessel. She was guilty of a violation of blockade, both in going into Vera Cruz and coming out of it.

The guilt of a breach inward is not discharged until the end

of the return voyage; and if a vessel is taken in any part of that voyage, she is taken *in delicto.* The Frederick Molke, 1 Rob. 87; The Lisette, 6 Rob. 395; The Joseph, 8 Cranch, 451.

The act of egress is as culpable as the act of ingress. The case of the Frederick Molke, above cited, is identical with the present. The Vrouw Judith, 1 Rob. 151; The Neptunus, 1 Rob. 171; The Adelaide, 2 Rob. 111, note. The cases of the Juffrow Maria Schrœder, 3 Rob. 153, and the Welvaart Van Pillaw, 2 Rob. 130, decide that the offence of running a blockade outward is not purged until the end of the voyage, and that until then the vessel so guilty is subject to capture by any cruiser of the blockading power.

There are exceptions in the case of egress. " A ship that has entered previous to the blockade may retire in ballast, or taking a cargo that has been put on board before the blockade." The *Juno,* 2 Rob. 118. That a belligerent may lawfully blockade the port of his enemy is admitted; but it is also admitted that this blockade does not, according to modern usage, extend to a neutral vessel found in port, nor prevent her coming out with the cargo which was on board when the blockade was instituted. Olivera *v.* Union Insurance Company, 3 Wheat. 194; 1 Kent, 147. The Jeune Nelly does not come within either of these exceptions. There are other exceptions, for which see Wheaton's Elements, 548, and 2 Wildman, 201, but which have no bearing in this case.

But to come to the question in the case, Were the property and effects of the neutral Guillem, on board the Jeune Nelly when she broke the blockade outward, liable to capture? The court below has decided they were not, on the ground that Guillem had left Mexico with an intention to return to France, and therefore was no longer a resident of the power with whom the United States were at war. It is a well-known law, that, if a neutral reside in the country of one of the belligerents, his property and effects sent from that country are liable to capture by the other, as enemy's property, wherever found on the ocean. 1 Kent's Com. 75. A national character, however acquired by residence, may be thrown off at pleasure by a return to the native country. It is an adventitious character, and ceases by non-residence, or when a party puts himself in motion, *bonâ fide,* to quit the country, *sine animo revertendi,* and such an intention is essential to enable him to resume his native character. 1 Kent's Com. 78.

But with all due deference it is submitted that these doctrines have no application in a case of capture for breach of blockade. A blockade has the effect to seal and shut up the blockaded port against all trade whatsoever. Sir William

Scott says it would not properly be a blockade unless neutrals were restricted.

"A blockade may be more or less rigorous, either for the single purpose of watching the military operations of the enemy, and preventing the egress of their fleet, as at Cadiz; or on a more extended scale, to cut off all access of neutral vessels to that interdicted place, which is strictly and properly a blockade; for the other is, in truth, no blockade at all, as far as neutrals are concerned. It is an undoubted right of belligerents to impose such a blockade, though a severe right, and as such not to be extended by construction; it may operate as a grievance on neutrals, but it is one to which, by the law of nations, they are bound to submit." The Juffrow Maria Schrœder, 3 Rob. 154.

The decision in the case of the Vrouw Judith, 1 Rob. 151, which was a case of violation of blockade outward by a neutral, says: " Now, with respect to the matter of blockade, I must observe that a blockade is just as much violated by a vessel passing outwards as inwards. A blockade is a sort of circumvallation round a place, by which all foreign connection and correspondence is, as far as human force can effect it, to be entirely cut off. It is intended to suspend the entire commerce of the place, and a neutral is no more at liberty to assist the traffic of exportation than of importation."

"To shut up the ports of a country, and exclude neutrals from all commerce, is a great inconvenience upon them, although it is one to which they are bound to submit; for there is no principle of the law of nations better established, than that a belligerent has a right to impose a blockade on the ports of his enemy." The Juno, 2 Rob. 117.

On the part of the United States it will therefore be contended: —

1. That the money of Guillem was liable to capture.

The consequence of a breach of blockade is the confiscation of the ship, and the cargo is always *primâ facie* implicated in the guilt of the owner and master of the ship. 1 Kent's Com. 151.

In the case of the Mercurius, 1 Rob. 84, it is decided that, to make the conduct of the ship affect the cargo, it is necessary to show that the owners of the cargo were conusant of the blockade before the cargo was shipped; or to show that the act of the master binds them.

The blockade of Vera Cruz was established shortly after the declaration of war, in May, 1846. Now Guillem was at that time, and up to the day of his departure, living in the city, and must have daily seen the blockading squadron cruising off the port, and could not pretend ignorance of the blockade. Both

in his claim and examination as a witness, he admits that he knew of it; yet, with full knowledge of its existence, and as if in defiance and derision of it, he embarked his property on board. He was, therefore, by his own admission, guilty, and his property is good prize. " A breach of blockade subjects the property of all those concerned in it to confiscation. The penalty attaches to all those who are privy to the fraud, by themselves or their agents. 2 Wildman, 203, referring to the case of the Wasser Hundt, Dodson, 27.

But it is said that this money is not good prize, because it was not shipped as cargo. In maritime warfare, private property taken at sea, or afloat in port, is indiscriminately liable to capture and confiscation. Wheaton's Elements, 405.

Besides, money has been recognized by Congress as good prize of war. By the eighth article of the rules and regulations of the navy, (2 Stat. at Large, 46), it is declared: " That no person shall take out of a prize, or vessel seized as prize, any money, plate, goods, or any part of her rigging, unless it be for the better preservation thereof, or absolutely necessary for the use of any of the vessels of the United States, before the same shall be adjudged lawful prize by a competent court; but the whole, without fraud, concealment, or embezzlement, shall be brought in, and judgment passed thereon, upon pain that every person offending herein shall forfeit his share of the capture, and suffer such further punishment as a court-martial, or the court of admiralty in which the prize is adjudged, shall impose."

And by the ninth article it is declared: " That no person in the navy shall strip off their clothes, or pillage, or in any manner maltreat persons taken on board a prize, on pain of such punishment as a court-martial shall adjudge."

It has been before remarked, that Lieutenant McLaughlin must have been misinformed as to the money being taken from the persons of the people found on board the Jeune Nelly. Guillem himself admits that, with the exception of the ninety-seven and a half doubloons, it was taken by the boats of the Mississippi from the wreck to that vessel, in buckets, the bags containing it having burst. As to the imputation cast upon an officer who is not named, as to the ninety-seven and a half doubloons, there is not a particle of evidence in the case to sustain it.

2. That no permission had been given either by General Scott or Commodore Perry, at the time Guillem left Vera Cruz, allowing neutrals to leave that port with their property.

By the letters of General Scott and Commodore Perry before referred to, all the permission allowed to neutrals was to

have intercourse with the vessels of war of their respective countries, and even that permission was withdrawn on the 22d of March.

General Scott, in his letter of that date to Commodore Perry, says: " I have this moment received your note of this date, inquiring whether, in my opinion, it may not be a necessary measure of expediency to stop, for the present, the intercourse heretofore allowed between the neutral vessels of war, off this coast, and the city and castle of Vera Cruz." General Scott approved of the course suggested.

Commodore Perry, in his letters to the commanders of the foreign vessels of war, on the same day, says: " The city and castle of Vera Cruz being now closely besieged and blockaded by the military and naval forces of the United States, it has become necessary to prevent all communication from outside, unless under a flag of truce. I am, therefore, constrained to inform you, that all intercourse between the vessels and boats under your command, and that part of the Mexican coast encompassed by the United States forces, must for the present cease."

General Scott, in his letter to Secretary Marcy under date of the 25th of March, says: " That, although on the 13th of March I had already refused to allow any persons whatever to pass the line of investment either way, yet the blockade had been left open to the consuls and other neutrals, to pass out to their respective ships of war, up to the 22d instant," and that this intercourse was then stopped.

General Scott's letter to the consuls is to the same effect, speaking only of communication between the neutrals in the city and the ships of war of their respective nations.

There is not one word in these letters which affords a pretence to say that neutrals were allowed to ship their property.

This case has been presented as one of hardship. On this subject the court said, in the case of the Joseph, 8 Cranch, 454: " Although these considerations, if founded in truth, present a case of peculiar hardship, yet they afford no legal excuse which it is competent to this court to admit as the basis of its decision."

*Mr. Soulé,* for the claimant, made the following points: —

1st. Guillem was a native of France not naturalized, had resided in Mexico only three years, was not a merchant or trader, but only a cook. The money carried by him was not shipped as cargo, did not appear on any manifest, and was his necessary means of support; and was no more to be interfered with than if it had been a bill of exchange or bank-notes.

2d. As soon as neutrals who reside in an enemy's country turn their back on the enemy's country, they resume their neutral character. Wheaton on Int. Law, 371, 374, 375, 378; 1 Kent's Com. 75, 77, 78.

3d. Any one has a right to embark, even in a vessel guilty of the violation of the blockade, as a passenger, and himself and his personal effects are not to be interfered with. The guilt of the vessel does not attach to the passenger and his effects. By personal effects are meant his baggage, wearing apparel, and other property attached to his person, in contradistinction to goods and merchandise.

4th. The permission of General Scott to leave Vera Cruz, and repair on board of national vessels, justifies Guillem in going on board of the Jeune Nelly; and his having taken his passport to go by the British steamer in February, 1847, shows that it was not his intention to violate the blockade; and his embarking in the Jeune Nelly must be considered as an act of necessity and distress, there being no other means of leaving Vera Cruz.

First Point. The nationality of Guillem is proved by his own oath, by the testimony of Cassalet, and the passport of the French consul; and the same evidence proves that he was not naturalized, and that his residence had been only three years. Sir William Scott lays it down that the shortest period of time to establish a residence is four years; and all the authorities seem to consider that the rule of residence and identification with the enemy attaches more particularly to the commercial character, and the property captured is always spoken of as cargo or merchandise. In the present case Guillem was a cook; what he had with him was money, which is a personal effect. In countries where no banks exist, a man travels with gold and silver. The most extraordinary part of this transaction was, that Guillem had ninety-seven and a half doubloons in his pocket; and when invited to change his clothes, which were wet, and he was emptying his pockets for that purpose, an American officer who had proffered him the change of clothes laid his hand upon the money. A cook, no more than any other person, can travel with a wife and children without money. The present case bears not the slightest analogy to the case of Henry Rogers et al. and United States v. The American Schooner Amado. In that case, Rogers had resided thirteen years in Mexico, and still remained there. The cargo was taken in a vessel sailing under Mexican colors, which was owned by Rogers, who was a merchant. His residence, the nature of the cargo, and the circumstances under which it was captured, all stamped the

'vessel and cargo as Mexican. It has been said by an able writer, that truth depends upon distinction, and that law is the science of distinction. It is impossible for a mind accustomed to discrimination not to perceive the most manifest distinction between the two cases.

Second Point. The second point is fully sustained by the authorities cited; and we have only to inquire whether the facts of the case bring Guillem within the exception laid down in the law. Sir William Scott, in the case of the Harmony (2 Rob. Adm. 324), says: "Time is the grand ingredient in constituting domicile." In most cases it is unavoidably conclusive; and in that case that eminent person decided that four years were sufficient to fix the domicile of the party. In the case of the Indian Chief, determined in 1800, Sir William Scott said (Wheaton on Int. Law, 371): "Taking it to be clear that the national character of Mr. Johnson, as a British merchant, was founded in residence only, that it was acquired by residence, and rested on that circumstance alone, it must be held that, from the moment he turned his back on the country where he had resided, on his way to his own country, he was in the act of resuming his original character, and must be considered as an American. The character that is gained by residence ceases by non-residence. It is an adventitious character, and no longer adheres to him from the moment that he puts himself in motion, *bonâ fide,* to quit the country, *sine animo revertendi.*" In the case of the Ocean, determined in 1804, Sir William Scott says (Wheaton on Int. Law, 375): "It would, I think, be going further than the law requires, to conclude this person by his former occupation, and by his constrained residence in France, so as not to admit him to have taken himself out of the effect of supervening hostilities, by the means which he had used for his removal. On sufficient proof being made of the property, I shall be disposed to hold him entitled to restitution." Again, in the case of the Drie Gebroeders (Wheaton on Int. Law, 375), Sir William Scott observes, that "pretences of withdrawing funds are, at all times, to be watched with considerable jealousy; but when the transaction appears to have been conducted *bonâ fide* with that view, and to be directed only to the removal of property which the accidents of war may have lodged in the belligerent country, cases of this kind are entitled to be treated with some indulgence." Wheaton, Int. Law, 378, says: "But this national character which a man acquires by residence may be thrown off at pleasure by a return to his native country, or even by turning his back on the country in which he resided, on his way to another. The reasonableness of this rule can hardly be disputed.

Having once acquired a national character by residence in a foreign country, he ought to be bound by all the consequences of it until he has thrown it off, either by an actual return to his native country, or to that where he was naturalized, or by commencing his removal, *bonâ fide*, and without an intention of returning. If any thing short of actual removal be admitted to work a change in the national character acquired by residence, it seems perfectly reasonable that the evidence of a *bonâ fide* intention should be such as to leave no doubt of its sincerity." The same doctrine is recognized by Kent, as being the rule of decision in the courts of the United States. See Kent's Com. 75, 77, 78, and the authorities there cited.

Guillem comes completely within the rule. The war between Mexico and the United States broke out very unexpectedly in May or June, 1846, without formal declaration, and more resembled the incursions of our aborigines than the usual mode of making war adopted in a civilized country. Commissioners to make peace accompanied our invading army, and no one could realize that there was to be any permanent war between the United States and Mexico, and proposals of peace were expected to accompany every despatch. It was fully expected that, when the Northern army should reach Monterey, the war would certainly come to a close. These circumstances fully explain and account for the stay of Guillem from June 1846, to February, 1847. Some time might be necessary to collect what was due to him; his term of contract might not have expired, and the blockade itself interposed a difficulty against leaving Vera Cruz, for it was not possible to leave Mexico and go to a neutral country otherwise than by sea. But as soon as it was found that the war had assumed a permanent character, that an army had been sent to invade Mexico, Guillem resolved to leave with his wife and children, and the result of their industry and economy, and accordingly prepared to embark in February in the British steamer. The wreck of that vessel on the island of Cuba defeated his intention. His own statement and that of Cassalet of the manner in which La Jeune Nelly entered Vera Cruz, in open day in fine weather, on the 13th of March, might well induce him to believe that she had entered by permission. This was the very day on which, according to General Scott's despatch, he had given permission to neutrals to withdraw. This communication had doubtless been made known to the French naval authorities. It does not appear that La Jeune Nelly took in cargo; and for aught we know she might have considered herself within the permission granted by General Scott, with the consent of Commodore Perry, to leave the blockade open to the consuls and other neutrals, to pass out to their respective

ships of war, up to the 22d of March. If the blockade was left open to neutral persons to pass out, it was surely left open for the neutral vessels which should convey them; and the guilt of La Jeune Nelly in running the blockade, if indeed she did run it, was purged by the permission thus given to neutrals to pass out in neutral vessels, and was the reason why La Jeune Nelly left Vera Cruz on the 20th of March in open day, with her colors flying and fearless of interruption. And this is the reason why the capture of that vessel and her shipwreck have been made cause of claim against the government of the United States. And surely, under these circumstances, the property of Guillem, a neutral who left Vera Cruz with the blockade open, cannot be condemned. La Jeune Nelly was on her way from Vera Cruz to Sacrificios when she was captured and wrecked; and if neutrals were permitted to go to Sacrificios, their movements afterwards cannot be controlled. All these circumstances should be construed very favorably towards a party so peculiarly situated.

Third Point. But admitting that La Jeune Nelly had violated the blockade, and that the permission of General Scott and Commodore Perry to neutrals to depart did not purge the violation, and that she was a guilty vessel, and with her cargo was subject to condemnation, it is contended for the claimant, that this guilt and liability to condemnation do not in any manner extend to a passenger and his effects. The French crew of La Jeune Nelly could not be made prisoners of war, nor punished in any other manner, nor could their personal effects be confiscated; *a fortiori* could not those of a passenger. The decided cases settle beyond dispute, that the person and property of a neutral, withdrawing himself after the breaking out of war from the enemy's country, even on board of an enemy's vessel, are not subject to condemnation. The flag does not protect any enemy's property in neutral bottom, and neutral property, if not contraband of war, is not condemned by the character of the flag or of the bottom; and if, in place of being gold and silver, the currency of the country and the personal effects of the neutral, Guillem had converted his property into any of the productions of Mexico, and sailed in a Mexican vessel with his family, and with the undoubted purpose of withdrawing himself from the Mexican dominions, his property would not have been liable to condemnation. This point is fully established by the case of the Indian Chief, above referred to.

If the argument has satisfied the court that Guillem's three thousand dollars, the earnings of his three years' labor, can in no proper sense of the words of the English language be called cargo, but are, and are to be considered as, the baggage and

personal effects of Guillem, it is impossible to conceive how the conclusion is ever to be arrived at, that they are subject to condemnation because he embarked in a guilty vessel. In favor of neutrals, the laws of war are to be strictly construed. A neutral vessel, violating a blockade, and her cargo, are to be condemned as prize of war; but was it ever heard of that the neutral individuals were made prisoners, their watches taken from their pockets, or their money from their purses? No such case can be produced, and the judge would be considered as having a *furor* for condemnation, who should establish the precedent. Whether or not gold and silver are to be considered as merchandise in regard to the laws of war, will depend on the purposes for which they are shipped. If sent for the purpose of paying a debt, or for the purpose of purchasing merchandise, they may well be considered as cargo; but if carried by a man who is emigrating to a foreign country or returning to his own, and used as the means of taking his property along with him, they cannot be considered as cargo. Every case of this kind must depend on the circumstances which surround it. Guillem leaving Mexico with his wife and children, ignorant of commerce and not confiding in the engagements of merchants, and perhaps unable to procure them, carried with him his small fortune, in the only shape and form of money with which he was familiar. Is there no difference between money carried as the personal property of the passenger, and money shipped for the ordinary purposes of commerce? If this distinction be made, it is impossible to understand how the three thousand dollars of gold and silver carried by Guillem, one half of it on his person, can be condemned as the cargo of La Jeune Nelly.

Fourth Point. The statement of this point carries its own argument with it. If the blockade was raised for the purpose of permitting neutrals to go on board of the neutral ships of war, it is to be supposed they would be permitted to carry their clothes, personal effects, baggage, and money with them. We must suppose that they could have gone to the neutral ships of war either in cutters or other small craft of those vessels, or in Mexican craft. It was to be supposed that General Scott and Commodore Perry were in good faith in giving this permission, and in raising the blockade for the escape of neutrals, and so long as neutrals took advantage of this permission in good faith, and did not attempt to cover Mexican property, our courts would respect and enforce the rights thus conferred. The libel in the present case is said to be for the benefit of the officers and men of the vessels of the squadron in the Gulf of Mexico. This squadron was commanded by Commodore Perry, and neither he, his officers, nor men will be allowed to profit by the breach of the permission thus given to neutrals to with-

draw themselves. When once on board of the neutral ships of war, the neutrals are at liberty to go where they please; whether the raising of the blockade extended to La Jeune Nelly or not, is a question which remains to be settled between the governments; but it is presumed that the courts will compel respect to such a permission given by the commander of the naval and land forces of the United States. In every point of view, therefore, in which the case can be considered, it is believed that this court will affirm the judgment of the Circuit Court, and will decree that the costs be paid out of that part of the property seized which was condemned.

Mr. Chief Justice TANEY delivered the opinion of the court.

There is no dispute about the material facts in this case. The claimant was a citizen of France who had been domiciled in Mexico about three years, following the occupation of a cook in a hotel, and was returning with his family to reside in his own country when the capture was made. They sailed from Vera Cruz in a French vessel bound to Havre. The money he had with him, and which is now in question, was not shipped as cargo, or for the purposes of trade. It amounted to only two thousand eight hundred and sixty dollars; and was the earnings of his industry in Mexico, and taken with him for the support of himself and his family upon their return to France. The hostile character which his domicile in Mexico had impressed upon him and his property had therefore been thrown off; and as soon as he sailed from Vera Cruz he resumed the character of a French citizen, and as such was entitled to the rights and privileges of a neutral, in regard to his property, as well as in his person. The rights of the neutral in this respect have always been recognized in the prize courts of England, and were sanctioned by this court in the case of the Venus, 8 Cranch, 280, 281. Indeed, we do not understand that the appellants claim to have this money condemned upon the ground that it was liable to be treated as the property of an enemy, on account of the previous domicile of Guillem. But it is insisted that, if it is regarded as the property of a neutral, it was shipped in violation of the blockade; and that the character of the vessel in which it was found also subjects it to condemnation.

So far as concerns the breach of blockade, the attempt to pass out of the port with this money was not of itself an offence, apart from the vessel in which he sailed. The blockade had been opened for the purpose of enabling consuls and other neutrals to pass out to their respective ships of war, soon after General Scott landed and invested the town. And it continued open for that purpose until the 22d of March. It is

true that the permission was confined to ships of war. But the reason is obvious. They were the only vessels that could be safely allowed to communicate with the town then closely besieged. And the permission was restricted to them, because it was believed that commanders of national vessels would not suffer a privilege granted to neutrals from motives of humanity to be used for improper purposes.

But the object and intention of this order were evidently, not merely to enable the neutral to avoid the hazards of the approaching bombardment, but to afford him an opportunity to leave the enemy's country, and return to his own, if he desired to do so. The neutral was not required or expected to remain on board the ship of war. The permission opened to him a path by which he might escape altogether from a country about to be visited with the calamities of war. It therefore necessarily carried with it the permission to take with him the means of supporting himself and his family, on their voyage home and after their return. The order contains no restriction upon this subject, and to imply any would be inconsistent with the motive by which it was evidently dictated. The Jeune Nelly, in which the claimant embarked, sailed on the 19th of March, while the blockade was still open for the purposes above mentioned. It was no breach of the blockade, therefore, for the claimant to pass out of the town at that time on his voyage home, and to take with him the sum of money his industry had accumulated, and which was necessary for the support of himself and his family on their arrival in their own country. The port was not then closed against the egress of neutrals from the hostile country; nor were they forbidden to take with them the money necessary for their support. And if Guillem had gone on board a French ship of war for the purpose of returning home, and taken with him this small sum of money, his right to do so could not be questioned.

But it is supposed that the character of the vessel in which he embarked subjects his property to forfeiture. La Jeune Nelly had entered the port in violation of the blockade; and endeavored to break it a second time by leaving the port without permission. She was undoubtedly liable to capture and condemnation. But it does not by any means follow, that the property of the claimant is implicated in the guilt of the vessel, or must share in the punishment. There is no evidence to show that he had knowledge of the previous breach of blockade, or of the intention to break it again in going out. She was a neutral vessel belonging to his own country, and had come into the port in open day under the French flag; and she sailed again in a manner equally open, and without any

apparent design of concealing her movements from the blockading squadron. The permission granted by the American commanders had as a matter of course been made public in Vera Cruz; and Guillem must without doubt have seen citizens of neutral nations daily leaving the city for the ships of war, and taking with them the necessary means of support for themselves and their families. He appears to have done nothing more than avail himself of the most convenient opportunity that offered in order to accomplish the same object; and if he did not participate in the design of breaking the blockade, his property is not affected by the misconduct of the vessel in which it was shipped. Even in the case of cargo shipped as a mercantile adventure, and found on board of a vessel liable to condemnation for a breach of blockade, although it is *primâ facie* involved in the offence of the vessel, yet, if the owner can show that he did not participate in the offence, his property is not liable to forfeiture. This is the rule as stated by Sir William Scott in the case of the Alexander, 4 Rob. 93, and in the case of the Exchange, 1 Edwards, 39, and recognized in 1 Kent's Com. 151. And yet, in the case of a cargo shipped for the purposes of commerce, the breach of blockade is almost always committed by the vessel for the benefit of the cargo, and to carry out some mercantile speculation *injurious* to the rights of the belligerent nation whose ships are blockading the port. The case before us is a stronger one in favor of the claimant than that of the innocent owner of a cargo. The money in question was not shipped as cargo or as a mercantile adventure. Guillem was a passenger on board, with his whole family, and the money was a part of his personal effects necessary for their support and comfort. The shipment of the money could give no aid or comfort to the enemy. And in taking his passage in the Jeune Nelly, his intention, as far as it can be ascertained from the testimony, was merely to return to his own country, in a mode better suited to his humble circumstances and more convenient to his family, than by passing through the ships of war. In the opinion of the court, the money he took with him was not liable to condemnation on account of the guilt of the vessel, and the decree of the Circuit Court is therefore affirmed.

### *Order.*

This cause came on to be heard on the transcript of the record from the Circuit Court of the United States for the District of Louisiana, and was argued by counsel. On consideration whereof, it is now here ordered, adjudged, and decreed by this court, that the decree of the said Circuit Court in this cause be, and the same is hereby, affirmed.