**Billy Joe MARTIN, Appellant,**

v.

**UNITED STATES of America,**
**Appellee.**

**No. 22586.**

United States Court of Appeals
Ninth Circuit.

Aug. 1, 1968.

Certiorari Denied Dec. 9, 1968.

See 89 S.Ct. 466.

**150**

John Hart Ely (argued), J. Edward Harris, San Diego, Cal., for appellant.

Joseph W. Milchen (argued), Asst. U. S. Atty., Edwin L. Miller, Jr., U. S. Atty., San Diego, Cal., for appellee.

Before BARNES and HAMLIN, Circuit Judges, and SWEIGERT, District Judge*.

HAMLIN, Circuit Judge:

Billy Joe Martin, appellant herein, was convicted after a jury trial in the United States District Court for the Southern District of California for a violation of 21 U.S.C. § 174 (smuggling narcotics). He made a timely appeal to this court, which has jurisdiction under 28 U.S.C. § 1291.

* WILLIAM T. SWEIGERT, United States District Judge for the Northern District of California, sitting by designation.

1. "STATEMENT OF RIGHTS
"Before we ask you any questions, it is my duty to advise you of your rights.

Appellant was stopped by United States Customs Inspector Geiger at the San Ysidro port of entry while he was driving across the Mexican border into the United States. Geiger questioned appellant about his citizenship, the purpose of his trip, and whether or not he was bringing anything back from Mexico. Appellant appeared to be very talkative and Mr. Geiger advised him to drive into the secondary customs area, where he was asked to go into the office. Geiger then asked him to remove his coat; appellant did so and handed it to him. Geiger observed that the coat seemed to be bulky on one side and that there was a large amount of pink tissue paper in the inside pocket. As Geiger started to look inside the jacket to see what the bulky package was, appellant said, "I bet I know what that is; somebody must have put that there." The package was opened and found to contain what was later stipulated to be five packets of heroin weighing a total of 4.30 ounces. A little later a customs agent with the Bureau of Customs, Treasury Department, one Mr. Jackson, took over and advised appellant "that he did have certain constitutional rights, that he had a right to remain silent, that he didn't have to make any statements, sign any papers unless he so desired, that he was entitled to and would be provided with an attorney of his choice, and if he couldn't afford one the government would provide one at any and all times of the proceedings relative to his interrogation." He was also advised that "the statements he did make if he chose to make any could and might be used against him." He was then given a "Rights of Waiver" form which was read by the appellant and signed by him. This signed waiver is set out in the margin.[1]

"You have the right to remain silent.
"Anything you say can be used against you in court, or other proceedings.

"You have the right to consult an attorney before making any statement or answering any question, and you may

Appellant then told Jackson that he had gone from Los Angeles to Mexico on a pleasure trip; that he had visited a house of ill repute in Tijuana; that he had become intoxicated and that he had been drugged. When he was questioned at length about the heroin found in his coat, he first stated that an unidentified Mexican had given it to him and told him where to deliver it. Later he changed his story and disclaimed any knowledge concerning the heroin found in his possession and stated that he could not remember or did not know whom it belonged to.

A hearing was held before the district judge in the absence of the jury to determine whether the warning given to appellant either orally or in writing was sufficient under Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L. Ed.2d 694. The district judge held that the warning was not sufficient under *Miranda* and that nothing concerning the procuring of the heroin should be admitted into evidence.[2]

In the prosecution's case no attempt was made to introduce into evidence any part of appellant's story to the customs agents of his trip to Tijuana. However, when appellant himself testified he gave a rather bizarre and unusual story of having gone to Tijuana with a man known to him only as Jupiter, who gave him $1,000 while there. We have set out in the margin a summary of a portion of such testimony and excerpts of other testimony given by appellant.[3]

---

have him present with you during questioning.

"You may have an attorney appointed by the U. S. Commissioner or the Court to represent you if you cannot afford or otherwise obtain one.

"If you decide to answer questions now with or without a lawyer, you still have the right to stop the questioning at any time, or to stop the questioning for the purpose of consulting a lawyer.

"HOWEVER * * *

"You may waive the right to advice of counsel and your right to remain silent and answer questions or make a statement without consulting a lawyer if you so desire.

— — — — — — — — —
"WAIVER

"I have had the above statements of my rights read and explained to me and fully understand these rights. I waive them freely and voluntarily, without threat or intimidation and without any promise of reward or imunity [sic]. I was taken into custody at 11:57 PM (time), on 3/29/67 (date), and have signed this document at 1:00 AM (time), on 3/30/67 (date).

"BILLY JOE MARTIN
(name)
"Witnesses:
"JAMES W. JACKSON
(name)
"PRENTICE N. WHITE
(name)        "

2. After the judge stated that appellant's conversation with Mr. Jackson was an admission or confession and would not be admissible under *Miranda*, counsel for

appellant and counsel for the government had the following colloquy:

"MR. ELY: Excuse me, your Honor, just for Mr. Jackson's guidance as much as anything when he does take the stand, there are several other matters in there that perhaps we ought to clear up. What I am particularly concerned about, amongst other things, is the fact that according to Mr. Jackson, he changed his story during the interview.

"THE COURT: Well, I ruled that neither can come in.

"MR. ELY: Nothing concerning procuring the heroin?

"THE COURT: That's right, nothing concerning that. Do you understand that?

"THE WITNESS: I do.

"MR. ELY: Forgive me, could I ask— He went to the house of ill repute.

"THE COURT: That he was drunk.

"MR. ELY: Is that all that's left?

"THE WITNESS: That's it.

"MR. ELY: All right, if that's all that's going to come in, that all he told Mr. Jackson is that he went to the house of ill repute and that he got drunk, I would have no further objection."

3. At trial appellant related the following story concerning his trip to Mexico: He had been working as a musician in Los Angeles when he met a man named Jupiter who claimed to be a free lance agent. He met Jupiter on two or three occasions subsequent to their first meeting. On March 29 they again met by chance in Los Angeles and Jupiter asked if appellant had ever been to Tijuana. Appellant replied that he had not, and

On cross-examination government counsel asked appellant and received without objection the following question and answer:

"Q. Did you tell the customs officials at the border about Mr. Jupiter?"

"A. Yes, I told them."

On rebuttal the government called Agent Jackson. He testified as follows:

"Q. Referring to the early morning hours of March 30th of this year did you have an opportunity to have a conversation with the defendant?

"A. Yes, I did.

"Q. Where did this conversation take place?

"A. At the border port of entry, San Ysidro * * *.

"Q. During the course of this conversation did the defendant ever tell you anything about a man named Jupiter?

"A. Not to my recollection." [4]

Jupiter asked if he would like to go. Appellant agreed to go, and the two men proceeded to drive down in appellant's car, with Jupiter doing the driving. Appellant had only taken $51 of his own money. When they got to Tijuana Jupiter asked appellant if he knew anything about dog racing. Jupiter also asked appellant if he would like to have a good time. Appellant replied, "I would like that, that's what I come down here for." Jupiter then gave appellant some money. Appellant gave the following testimony concerning subsequent events in Mexico:

"He started counting out money in the seat. At this particular time I took the steering wheel over. He counted the money. He said, 'Help yourself.'

"I reached over and grabbed two twenties and said, 'Thanks a lot.'

"He said, 'All the money is yours.'

"Q Did he tell you why?

"A At no time did he mention anything about—he told me he understood about me being locked up, to have myself a ball and that all the money was mine.

"Q How much money did he give you?

"A He gave me a thousand dollars.

"Q What did you do with it?

"A I told him, 'I never had this much money in my life. I can start having fun right now by buying me some clothes and things.'

"I went down and bought gifts and some shoes, and had about a hundred and twenty-some dollars and stuck inside shirt pocket.

"Q About how much did you spend on clothes?

"A Approximately $300, I would say.

"Q You put a hundred and twenty-five dollars in your shirt. What did you do with the rest of it?

"A Rest of the money—I remember I took the money and put in my left pocket, with my $51.

"Q Was this man Jupiter, was he with you all the time you were shopping?

"A Yes, sir, he were.

"Q What did you do then?

"A Went shopping. Then we rode around different places until it was dark, until we went to this house everybody been talking about.

"Q House of ill fame?

"A Yeah, he said, 'Come on and have some fun, that's what I brought you here for.'

"I told him, 'I'm ready to go home, I got my fun in my pocket,' you know.

"He said, 'Well, what do you want to do, just sit there and look stupid? Have yourself a ball.'

"I said, 'No, I don't know nobody around here. I'm ready to go home.'

"He said, 'Okay, we'll have a drink and we'll go home.'

"I told him I didn't drink. He went and got some Tequila and came back. I took the Tequila and I drank that, and then I wake up in my car."

*       *       *       *       *

"A Something happened, I know I woke up in my car, you know. When I woke up all the gifts that I had in the car was gone, and the money I had inside my shirt pocket was gone. I remember I was parked almost at the border. I could see the border. I turned around and went back downtown, walked around about half an hour, trying to find the guy. So I decided I was going home. I got in the car and then I went up to the border."

4. Counsel for appellant in the absence of the jury, stated to the court that he objected to the asking of the above questions, and the court stated that he would allow the question "under the theory that it is a matter of collateral and can be used for the purpose of impeachment."

Appellant contends that the admission of this question and answer was error. We disagree.

■ The government contends that the warnings given to appellant were sufficient under the rule of Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, and that the district court was in error in not permitting the government to introduce the entire statement made by appellant to the customs officials.

In support of this argument counsel for the government points out that the oral warning given to appellant together with the written warning signed by him sufficiently complied with the requirements of *Miranda.* This is a very close question, particularly when we compare the warning given with some of the language found in *Miranda.*[5] The government's argument is persuasive. However, assuming *arguendo* that the warning did not sufficiently comply with *Miranda,* the challenged question was still proper. The opinions in *Miranda* occupy over a hundred pages. The Court is there mainly concerned with preventing the introduction in evidence of any incriminating statement made by a defendant where the proper warning has not been given. Nowhere is there any reference to excluding evidence that the defendant *did not* say something. The nearest the decision comes to this matter is found in the following statement: "The privilege against self-incrimination protects the individual from being *compelled to incriminate himself* in any manner; it does not distinguish between degrees of incrimination. Sim-ilarly, for precisely the same reason no distinction may be drawn between inculpatory statements and statements alleged to be merely 'exculpatory'."

In this case the question asked of Agent Jackson called for neither an inculpatory nor an exculpatory statement. Indeed, it did, not call for evidence of any *statement* at all, but merely pointed out that to the witness' recollection appellant had never mentioned the name Jupiter to the customs agents. It only reflected on the credibility of appellant's earlier testimony that he had told the agents about Jupiter. The facts in this case distinguish it from those in Groshart v. United States, 392 F.2d 172, 9th Cir., March 27, 1968. In *Groshart* the court dealt with statements that had actually been made by the appellant and were later used to impeach him. Here, however, the questioned impeaching evidence was not an earlier statement made by appellant. We therefore hold that the trial court did not err in allowing the question to and answer of Agent Jackson to be admitted.

■ The only other contention made by appellant is his claim that the district judge committed reversible error in sentencing appellant more harshly because he had announced an intention to appeal. We see no merit in this contention.[6] At the time of sentencing the record shows appellant had refused to make a statement to the probation officer, that he had a prior conviction and that he had spent a large part of his adult life in prison. Counsel for appellant stated:

5. "Our holding will be spelled out with some specificity in the pages which follow but briefly stated it is this: the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. * * * Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and

that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently." Miranda v. State of Arizona, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694.

6. The court fixed the sentences on the two counts concurrent with each other and also concurrent with a jail sentence appellant was then serving.

"Mr. Ely: Well, certainly in order to—we have already discussed whether or not an intention to appeal is to be a factor."

and the court replied:

"The Court: Oh, that's not a factor at all."

The record does not show that there was any abuse of discretion on the part of the district judge.

Judgment affirmed.