**Raymond R. FOWLE, Appellant,**

**v.**

**UNITED STATES of America,**
**Appellee.**

**No. 21074.**

United States Court of Appeals
Ninth Circuit.

April 14, 1969.

Luke McKissack, Los Angeles, Cal., for appellant.

James E. Shekoyan (appeared) Asst. U. S. Atty., Wm. Matthew Byrne, Jr., U. S. Atty., Robert L. Brosio, Asst. U. S. Atty., Los Angeles, Cal., for appellee.

Before BROWNING, and ELY, Circuit Judges, and FOLEY,* District Judge.

* Honorable Roger D. Foley, Chief Judge, United States District Court for the District of Nevada, sitting by designation.

ELY, Circuit Judge:

██ We dispose of this appeal by answering, in the negative, the one significant question which is presented. It is: "May the silence of an accused at the time of his arrest, chosen in the exercise of his privilege against self-incrimination, be used against him by the prosecution if, during his trial, he testifies in his own defense?"

Appellant was charged in a five-count indictment with having violated certain federal statutes proscribing the illegal possession and sale of heroin and cocaine. See 21 U.S.C. § 174; 26 U.S.C. § 4705(a). He appeals from the judgment of conviction which followed a jury's finding that he was guilty as charged.

It is unnecessary to review the evidence in its complete detail. The prosecution proved that an informant, one Clark, introduced Fowle to government narcotics agents. Thereafter, on two different occasions, Fowle sold narcotics to one of the agents.

Fowle testified in his own defense. His testimony was to the general effect that he had not intended to commit a crime. He insisted that he had been led to believe, by the informant Clark and by an associate of Clark, that Clark had become involved in narcotics traffic and was therefore in trouble with the federal authorities. According to Fowle's testimony, he was told that the authorities had promised Clark that if Clark would "set up" some other person, he, Clark, would be spared from prosecution. Fowle testified further that he made the sales in question in an effort to aid Clark and in the belief that, in doing so, he was assisting the Government. Until the moment of his arrest, according to his testimony, Fowle was under the impression that his participation was in the interest of, and in association with, the Government's law enforcement officials.

During its cross-examination of Fowle, the prosecution was permitted, over objection, to inquire:

"Q * * *

"At the time of your arrest, Mr. Fowle, did you tell the agents that you were setting up Mac [one of the Government's narcotics agents] with Mr. Clark?"

Fowle's answer was, "No, I didn't," and the prosecutor, in summation, commented effectively upon the testimony.[1]

The Government takes the position that since the defendant chose to testify in his own behalf, it was not impermissible to prove for the purpose of impeachment, and thereafter to comment upon the proof, that Fowle had chosen to remain silent at the time of his arrest. This argument is based on the Supreme Court's reasoning in Raffel v. United States, 271 U.S. 494, 46 S.Ct. 566, 70 L.Ed. 1054 (1926). There, a second trial was ordered when the first jury failed to reach a verdict. After relying on his privilege against self-incrimination by refusing to testify at his first trial, the accused took the stand during the second trial and attempted to refute certain testimony of a government witness. Over objection, Raffel was compelled to disclose that he had remained silent in the face of the same testimony at the earlier proceeding. The Supreme Court concluded that Raffel's silence under the circumstances was inconsis-

1. "And another thing, in deciding the plausibility of this man's story, remember something that is, to me, the topping on the cake, and that is this: He is arrested on December 14th for a very serious offense by several agents of the Federal Bureau of Narcotics.
"Now logically what is the first thing you are going to do when you are arrested for a fact? Do you say you really didn't have anything to do with it, or you were only working with other officers?
"You are going to shout your innocence, saying, 'I am working with officers, believe me, I didn't do anything, I am working with policemen.' And the defendant didn't. He never told these officers of the Federal Bureau of Narcotics this so-called story that he was really working kind of in an undercover capacity. * * *"

tent with his testimony at the second trial and was therefore probative evidence to impeach the credibility of his later representations. Moreover, the Court reasoned, such use of the defendant's silence did not violate his fifth amendment rights because, by electing to testify, he waived any rights connected with the privilege.

We cannot accept the contention here made by the Government for two significant reasons. First, the *Raffel* opinion's underlying assumption that silence in the face of accusation is sufficiently inconsistent with later explanation and testimony asserting innocence as to be of probative value to impeach that testimony has been rejected by the Supreme Court in Grunewald v. United States, 353 U.S. 391, 77 S.Ct. 963, 62 A.L.R.2d 1344, 1 L.Ed.2d 931 (1957). Second, such proof of the accused's silence violates his constitutional rights under more recent definitions of the scope and purposes of the Fifth Amendment.

## I. PROBATIVE VALUE OF PROOF OF SILENCE

■ A person's silence in most circumstances is so highly ambiguous that it is generally inadmissible, for its lack of probative value, on the question of whether, by his silence, that person has expressed agreement or disagreement with contemporaneous statements of others. One situation in which silence has been deemed more meaningful and thought to be so significant as to have probative weight is the case wherein it persists in the face of accusation. It has been assumed that an accused, in such circumstances would, more likely than not, dispute untrue accusations. *See* United States v. McKinney, 379 F.2d 259, 261 (6th Cir. 1967). It was upon this implicit assumption that the *Raffel* court held that the prior silence of the accused was admissible. There are, however, situations in which an accused is clearly under no duty to speak and where there are important reasons, regardless of guilt or innocence, for his maintaining silence. In such circumstances, since innocent and guilty alike may choose to stand mute, silence, even in the face of accusation, is highly ambiguous; hence, proof of such former silence should be excluded under universally recognized principles of evidence.

The Supreme Court adopted such a rationale in Grunewald v. United States, *supra*. There, one Halpern, one of the defendant-petitioners, was summoned before a grand jury; however, he refused to answer a series of questions on the asserted ground that his answers might incriminate him. During the subsequent trial, Halpern testified and answered the same questions perviously asked by the grand jury in a manner consistent with his innocence. Over objection, and relying upon *Raffel*, the trial judge allowed the prosecution, for the purpose of impeachment, to prove that Halpern had earlier refused to answer these questions.

The Supreme Court's majority opinion defined the issue raised by this use of Halpern's prior silence as an evidentiary problem: Did the trial court err in determining that the fifth amendment plea before the grand jury involved such an inconsistency with any of his trial testimony as to permit its use against him for purposes of impeachment? 353 U.S. at 418–419, 77 S.Ct. at 981. The Court relied upon the well-known principle that prior statements are admissible for impeachment only if they are in fact inconsistent with statements made at trial. Believing that the circumstances surrounding Halpern's silence before the grand jury justified his reliance on the Fifth Amendment, imposed no duty to speak upon him, and, most importantly, presented valid reason, regardless of his guilt or innocence, for his deferring comment, the High Court ruled that Halpern's silence was not sufficiently inconsistent to justify its use for impeachment.

"These factors are crucial in weighing whether a plea of the privilege is inconsistent with later exculpatory testimony on the same questions, for

the nature of the tribunal which subjects the witness to questioning bears heavily on what inferences can be drawn from a plea of the Fifth Amendment. * * * Innocent men are more likely to plead the privilege in secret proceedings, where they testify without advice of counsel and without opportunity for cross-examination, than in open court proceedings where cross-examination and judicially supervised procedure provide safeguards for establishing of the whole, as against the possibility of merely partial truth." *Id.* at 422–423, 77 S.Ct. at 983.

Here, the Government admits that Fowle was properly exercising his privilege to remain silent and was under no duty to respond to the officers' accusations. One confronted by the informal interrogation of arresting officers would, it seems to us, have more justification for awaiting less secret and more formal proceedings attended by procedural safeguards than did Halpern when he appeared before the grand jury.

"The constitutional protection against self-incrimination does not begin with the trial of a defendant on the charges against him. History tells us that it was the preliminary inquisition, prior to trial on the merits, which gave rise to the abuses, which resulted in the recognition of the privilege against self-incrimination. Under our law it is not the function of police officers to determine for the benefit of the jury whether or not a person under arrest on suspicion of crime has given a sufficient explanation at all, in fact that the accused here remained silent rather than risk unwitting distortion of his statement by a police officer at a later date does not give in law, and should not be allowed to give in fact, rise to an inference of guilt."

Helton v. United States, 221 F.2d 338, 341–342 (5th Cir. 1955). Surely, in such circumstances, Fowle's silence was no more contradictory of his later testimony than was the silence of Halpern.

Hence, considering the prosecution's use of Fowle's silence as purely a question of evidentiary law, *Gruenwald* supplies solid basis for reversal.

The United States Court of Appeals for the First Circuit has expressed agreement with this interpretation of *Grunewald*. *See* Fagundes v. United States, 340 F.2d 673 (1st Cir. 1965). There, the accused, in his trial testimony, sought to establish an alibi; however, on cross-examination, the prosecution was permitted to inquire as to why he had failed to protest his innocence when arrested. The court held that the attempt to impeach the accused's testimony in this manner was prejudicially erroneous.

"When one takes the stand in his own defense he of course puts his credibility as a witness in issue. Nevertheless we think it reversible error to permit evidence of refusal to talk and of request for counsel on arrest to be used for the purpose of impeachment. In the first place such evidence is ambiguous. Fagundes's words when arrested can as well be taken as indicating reliance upon constitutional rights as supporting an inference that his alibi was an afterthought. There is nothing to indicate which interpretation is more probable. *Cf.* Grunewald v. United States, 353 U.S. 391, 415–524, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957). * * *" *Id.* at 677.

## II. CONSTITUTIONALITY OF USING SILENCE AT ARREST TO IMPEACH LATER TESTIMONY GIVEN BY THE ACCUSED

We are likewise convinced that reversal is required because the prosecution's use of Fowle's silence violated the Fifth Amendment. As to this constitutional issue, it is desirable initially to point out, in response to one contention advanced by the Government, that the "collateral use doctrine" does not control the instant controversy. The doctrine, which arose following the decision of Walder v. United States, 347

U.S. 62, 74 S.Ct. 354, 98 L.Ed. 503 (1954), stands for the proposition that certain types of illegally obtained evidence may be used at trial to attack the credibility of a defendant who testifies in his own defense. The court of appeals decisions which developed the doctrine are discussed at length in our case of Groshart v. United States, 392 F.2d 172 (9th Cir. 1968). However, the present validity of the doctrine is extremely questionable. See, e. g., Blair v. United States, 401 F.2d 387 (D.C.Cir. May 2, 1968); United States ex rel. Hill v. Pinto, 394 F.2d 470 (3d Cir. April 23, 1968); Groshart v. United States, *supra*; State v. Brewton, 247 Or. 241, 422 P.2d 581, *cert. denied*, 387 U.S. 943, 87 S.Ct. 2074, 18 L.Ed.2d 1328 (1968). *See also* Comment, *Impeachment Exception to the Exclusionary Rules*, 34 U.Chi.L.Rev. 939 (1967). *Contra* State v. Jackson, 443 P.2d 279 (Kan. 1968). However, it is unnecessary for us to rely upon the assumption that the collateral use doctrine has been invalidated to reject the doctrine's application to the problem presented by Fowle. The collateral use exception to the exclusionary rules is justified by its adherents as an aid in the "search for truth."

> "An exclusionary rule, whether based on constitutional principles or not, is meant primarily to protect those accused of crime from unfair or unconstitutional police procedures by removing the strongest incentive to use such procedures. Such a rule often results in excluding highly reliable evidence in order to ensure that those who enforce the law will not profit from violating the law. But it does not follow that, if such evidence is excluded for one purpose, it must be excluded for all purposes. It is enough to deter illegal police activity if the government is prohibited from using evidence obtained by such activity to prove its direct case. In view of this adequate penalty, to deny to the government the use of Curry's [the accused] statement *to impeach his contrary testimony at trial*

would be an unnecessary impediment to the search for truth."

United States v. Curry, 358 F.2d 904, 911 (2d Cir. 1965), *cert. denied*, 385 U.S. 873, 87 S.Ct. 147, 17 L.Ed.2d 100 (1966). (Emphasis added). We have previously explained the ambiguous nature of Fowle's silence in the case before us. Hence the basic purpose of the collateral use doctrine—aiding the search for truth—is not served by proof of Fowle's original silence, and the Government's reliance upon the doctrine is misplaced.

We turn to the authorities which lead us to the conclusion that proof of Fowle's silence was not constitutionally permissible. Under the concurring opinion in *Grunewald,* written by Mr. Justice Black and endorsed by the Chief Justice, Mr. Justice Douglas, and Mr. Justice Brennan, the Court's reversal would not have rested solely upon the narrow evidentiary issue resolved by the majority. The concurring opinion reached the merits of the fundamental constitutional problem and determined that *any* adverse use of an accused's reliance upon his right to silence was inconsistent with fifth amendment principles.

> "I can think of no special circumstances that would justify use of a constitutional privilege to discredit or convict a person who asserts it. The value of constitutional privileges is largely destroyed if persons can be penalized for relying on them. It seems peculiarly incongruous and indefensible for courts which exist and act only under the Constitution to draw inferences of lack of honesty from invocation of a privilege deemed worthy of enshrinement in the Constitution. To the extent that approval of such a rule in Raffel v. United States, 271 U.S. 494, 46 S.Ct. 566, 70 L.Ed. 1054, has vitality after Johnson v. United States, 318 U.S. 189, 196–199, 63 S.Ct. 549, 87 L.Ed. 704, I think the *Raffel* case should be explicitly overruled." 353 U.S. at 425, 426, 77 S.Ct. at 984. (Emphasis added).

The gravamen of this concurring opinion is that to permit one's shielding of himself with his fifth amendment right to be converted into a weapon against him drains the right of much of its significance. The logic of this position has been implicitly accepted in more recent opinions of the Supreme Court; consequently, the increasing force of the *Grunewald* concurrence is manifest.

When, in Griffin v. California, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), it was held impermissible to comment upon the defendant's failure to testify during his trial, the Supreme Court, quite significantly, elaborated upon Mr. Justice Black's opinion in *Grunewald*:

"For comment on the refusal to testify is a remnant of the 'inquisitorial system of criminal justice,' Murphy v. Waterfront Comm'n of New York Harbor, 378 U.S. 52, 55, 84 S.Ct. 1594, 1596, 12 L.Ed.2d 678, which the Fifth Amendment outlaws. It is a penalty imposed by courts for exercising a constitutional privilege. It cuts down on the privilege by making its assertion costly. * * *" 380 U.S. at 614, 85 S.Ct. at 1232 (Citations omitted).

The Government, however, argues that *Griffin* is distinguishable from Fowle's case because Griffin's silence was employed to supply an inference of guilt, not to impeach. At the outset then, we must determine, assuming that the proof of Fowle's silence was offered solely for impeachment purposes, whether such proof constitutes an illegal *penalty* under the *Griffin* rule.

In situations wherein there are different consequences to the individual than those involved in *Griffin,* the Supreme Court has nonetheless made it clear that impermissible "penalties" may be imposed upon one against whom there are drawn adverse inferences from his assertion of the fifth amendment privilege. For example, in Spevack v. Klein, 385 U.S. 511, 87 S.Ct. 625, 17 L.Ed.2d 574 (1967), an attorney was disbarred for asserting his privilege against self-in-crimination. The Supreme Court explained that the definition of illegal penalties for exercising one's privilege against self-incrimination was not restricted to penalties of fines or imprisonment but included forfeiture of honor and the "deprivation of a livelihood." *See also* Garrity v. New Jersey, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967); Slochower v. Board of Higher Education, 350 U.S. 551, 76 S.Ct. 637, 100 L.Ed. 692 (1956).

"[T]he Self-Incrimination Clause of the Fifth Amendment * * * extends its protection to lawyers as well as to other individuals, * * * it should not be watered down by imposing the dishonor of disbarment and the deprivation of a livelihood as a price for asserting it. * * *

\* \* \* \* \*

"In this context 'penalty' is not restricted to fine or imprisonment. It means, we said in Griffin v. State of California, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106, the imposition of any sanction which makes assertion of the Fifth Amendment privilege 'costly.'" 385 U.S. at 514–515, 87 S.Ct. at 627.

It can hardly be denied that the adoption of the position now taken by the Government would impose a "costly" price upon those originally availing themselves of their fifth amendment rights. The Government says that if Fowle had wished to avoid all adverse inferences which might be drawn from his original silence in reliance on his constitutional rights, he should have sacrificed his constitutional right to testify in his own defense. *See* Ferguson v. Georgia, 365 U.S. 570, 602, 81 S.Ct. 756, 5 L.Ed.2d 783 (1961) (Clark, J., concurring). Surely, the sacrifice of a basic constitutional safeguard is a no less "costly" penalty for the exercise of one's right against self-incrimination upon arrest than the price of loss of one's livelihood. In the light of *Spevack's* broad definition of "penalty," we cannot accept the Government's attempted distinction of *Griffin.*

The Government urges that since Fowle chose to testify in his own defense, he must incur the "cost" of impeaching proof that he had earlier exercised his constitutional right to remain silent. But adopting the Government's position would require Fowle to bear a significant cost for his initial reliance upon the Fifth Amendment no matter what path he chooses at trial. If Fowle should have foregone his right to testify, that choice would undoubtedly prejudice his interests severely. The Supreme Court has acknowledged this rather evident fact, declaring that it is psychologically impossible for a jury not to apply adverse inferences against a defendant who fails to testify in his own behalf. *See* Bruno v. United States, 308 U.S. 287, 60 S.Ct. 198, 84 L.Ed. 257 (1939). If, on the other hand, Fowle testifies, as he did, his compelled admission that he remained silent when arrested is no less damaging to him on the ultimate issue of guilt. It is not likely that all jurors would find it psychologically possible to restrict the application of such proof to the narrow purpose for its admission—impeachment—notwithstanding the adequacy of jury instructions given by a careful trial judge. *See* United States v. Grunewald, 233 F.2d 556, 572 (2d Cir. 1956) (Frank, J., dissenting), *rev'd*, 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931, 62 A.L.R.2d 1344 (1957).

We simply cannot adopt an interpretation of the Fifth Amendment under which one exercising his right to remain silent upon and immediately after his arrest—a right which the Supreme Court has so earnestly sought to guarantee and preserve—is severely prejudiced by his recourse to that cherished right. It would be anamolous indeed if honorable law enforcement officers were required to elaborate upon the traditional fifth amendment warning and advise arrested persons, in effect: If you say anything, it may be used against you. You have the constitutional right to remain silent, but if you exercise it, that fact may be used against you. *See* McCarthy v. United States, 25 F.2d 298, 299 (6th Cir.

1928). *See also* United States v. McKinney, 379 F.2d 259, 262 (6th Cir. 1967); Ivey v. United States, 344 F.2d 770, 772–773 (5th Cir. 1965); United States v. Lo Biondo, 135 F.2d 130, 132 (2d Cir. 1943). This must have been one of the considerations which has moved the Supreme Court to adomnish:

"At the outset we must condemn the practice of imputing a sinister meaning to the exercise of a person's constitutional right under the Fifth Amendment. * * * *The privilege against self-incrimination would be reduced to a hollow mockery if its exercise could be taken as equivalent either to a confession of guilt or a conclusive presumption of perjury.* As we pointed out in *Ullmann* [Ullmann v. United States, 350 U.S. 422, 76 S.Ct. 497, 100 L.Ed. 511, 53 A.L.R.2d 1008] a witness may have reasonable fear of prosecution and yet be innocent of any wrongdoing. The privilege serves to protect the innocent who otherwise might be ensnared by ambiguous circumstances."

Slochower v. Board of Education, *supra*, 350 U.S. at 557–558, 76 S.Ct. at 641 (Emphasis added).

A significant decision bearing persuasively upon our problem is Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). There, the prosecution, seeking to prove the defendant's ownership of a suitcase, introduced earlier testimony which the defendant had given at a pre-trial motion to suppress evidence on fourth amendment grounds. The defendant, had he remained silent at the pre-trial hearing, would have been required to suffer admission of the illegally seized evidence. Since he waived his fifth amendment right to remain silent at the hearing on his motion to suppress the evidence, the prosecution insisted that the pre-trial testimony was available for its use in the subsequent trial. The Supreme Court declared that such a "Hobson's Choice" between constitutional privileges is intolerable. 390 U.S. at 394, 88 S.Ct. 967. Here, adoption of the Government's posi-

tion would likewise place Fowle on the horns of a dilemma, compelling him, impermissibly, to choose between constitutional rights and suffer prejudice from any choice which he has and exercises.

Finally, our conclusion is solidly supported by Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). There, the Chief Justice wrote:

> "In accord with our decision today, it is impermissible to *penalize* an individual for exercising his Fifth Amendment privilege when he is under police custodial interrogation. *The prosecution may not, therefore, use at trial the fact that he stood mute or claimed his privilege in the face of accusation.*"

384 U.S. at 468n.37, 86 S.Ct. at 1625 (Emphasis added). The italicized sentence has apparently been overlooked, at least on one occasion, by our court. In Martin v. United States, 400 F.2d 149 (9th Cir. 1968), we referred to *Miranda's* content of "over a hundred pages" and then, in dictum, continued, "Nowhere is there any reference to excluding evidence that the defendant *did not* say something." *Id.* at 153 (Emphasis in original). In *Martin,* the accused, after testifying to exculpating facts during his trial, was asked on cross-examination if he had told his arresting officers about an acquaintanceship concerning which he had testified in his direct examination and around which the defending testimony revolved. Martin's attorney did not object to the question, and Martin replied, "Yes, I told them." The prosecution, over objection, was permitted, during rebuttal, to introduce testimony by one of the arresting officers to the effect that Martin had not, "to [the officer's] recollection," said anything about the acquaintanceship at the time of his original interrogation. We held that the trial court did not err in admitting the rebutting proof.

■ We do not question the result reached in *Martin,* but we find that case distinguishable. If an accused desires to bolster his defense by testifying to an otherwise inadmissible statement, he invites proof in rebuttal that his claimed statement was never made. *Cf.* United States v. Fox, 403 F.2d 97, 103n.4 (2d Cir. 1968); United States v. Armetta, 378 F.2d 658, 662 (2d Cir. 1967); United States v. Vanterpool, 394 F.2d 697, 701 (2d Cir. 1968) (Waterman, J., concurring). His testimony that he made the statement may be deemed a waiver of his fifth amendment privilege to exclude evidence that he did not make the statement. In the present case, however, no waiver can be found, since Fowle had not previously offered any testimony as to the contents of any conversation at the time of his arrest and thereafter objected to any inquiry regarding what he had, or had not, said at that time. A further significant difference between this case and *Martin* is that the impeaching evidence in *Martin* contained none of the ambiguities which inhere in the exercise of the privilege against self-incrimination; it flatly contradicted the testimony which Martin, without interposing an objection, had voluntarily given during his cross-examination. Thus, the purpose of the collateral use doctrine —the search for truth—was furthered in *Martin,* whereas, as we have demonstrated, the doctrine's purpose would not necessarily have been served by application of the doctrine in the circumstances revealed by the record which is before us now.

In its explicit definition of required warnings, *Miranda* does not operate retroactively. Johnson v. New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966). Fowle was convicted before the issuance of the *Miranda* opinion; hence, we cannot, of course, rest our decision upon any claim by Fowle that he was inadequately warned at the time of his custodial interrogation. The relevance of the quoted *Miranda* language is readily apparent, however, when viewed in the context of the purposes sought to be served by the Supreme Court. *Miranda* represents an attempt to establish procedures which would frustrate coercive practices thought to be prevalent in some

police interrogation techniques. It was fervently hoped that the *Miranda* requirements would ultimately insure that statements made while in custody would truly be the product of one's free, uncoerced choice. *See* 384 U.S. at 458, 86 S.Ct. 1602. Among the coercive techniques which the Court hoped to eliminate was the following:

"The manuals also contain instructions for police on how to handle the individual who refuses to discuss the matter entirely, or who asks for an attorney or relatives. The examiner is to concede him the right to remain silent. 'This usually has a very undermining effect. First of all, he is disappointed in his expectation of an unfavorable reaction on the part of the interrogator. Secondly, a concession of his right to remain silent impresses the subject with the apparent fairness of his interrogator.' After this psychological conditioning, however, the officer is told to point out the incriminating significance of the suspect's refusal to talk:

'Joe, you have a right to remain silent. That's your privilege and I'm the last person in the world who'll try to take it away from you. If that's the way you want to leave this, O.K. But let me ask you this. Suppose you were in my shoes and I were in yours and you called me in to ask me about this and I told you, "I don't want to answer any of your questions." You'd think I had something to hide, and you'd probably be right in thinking that. That's exactly what I'll have to think about you, and so will everybody else. So let's sit here and talk this whole thing over.'

Few will persist in their initial refusal to talk, it is said, if this monologue is employed correctly."

384 U.S. at 453–454, 86 S.Ct. at 1617. Clearly, the Court reasoned that the elimination of this type of coercion, as well as unjustified charges of coercion, could be achieved by its expressed prohibition of prejudicial proof that an accused had "stood mute." 384 U.S. at 468n.37, 86 S.Ct. 1602. The coercive effect of the police procedure described and condemned by the Supreme Court would most certainly not be lessened, nor would the worthy objects of *Miranda* be less frustrated, if prosecuting authorities could skirt the Supreme Court's prohibition of proof that an accused had "stood mute * * * in the face of accusation." And, as we have already emphasized, we will not invite or encourage the sophistry which would attend an interrogating procedure under which police would be required to warn an arrested person that if he avails himself of his constitutional right to remain silent, proof that he did so may be subsequently offered to discredit any testimony presented by him at trial.

Reversed.