UNITED STATES of America

v.

Joseph C. LENARDO, Defendant.

Crim. A. No. 74–323.

United States District Court,
D. New Jersey.

Sept. 8, 1976.

Jonathan L. Goldstein, U. S. Atty., Newark, N. J. by Richard D. Gregorie, Sp. Atty., Organized Crime Section, Dept. of Justice, for plaintiff.

Louis P. Caroselli, Jersey City, N. J., for defendant.

OPINION

COOLAHAN, Senior District Judge.

This case comes before the Court on remand from the Third Circuit Court of Appeals for a determination of (1) the applicability of *United States v. Hale,* 422 U.S. 171, 95 S.Ct. 2133, 45 L.Ed.2d 99 (1975), to a case pending on direct appeal at the time *Hale* was decided, and (2) whether *Hale* requires a new trial under the circumstances of this case. After the remand, the United States Supreme Court decided *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), which determined the constitutional

issue left open in *Hale.* Because of the relevance of *Doyle* to the questions presented upon remand, the Court has considered the impact of that decision as well. These cases prohibit the use of a defendant's silence, after he has received his warnings under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), at the time of his arrest, to impeach his exculpatory trial testimony.

On March 14, 1975, after a two-day jury trial, Joseph C. Lenardo was found guilty of conspiracy to embezzle, steal and possess firearms stolen from interstate commerce, embezzlement and theft of an interstate shipment of firearms, and knowing possession of embezzled and stolen firearms, in violation of 18 U.S.C. §§ 371, 659. On April 29, 1975, this Court sentenced the defendant to three concurrent three-year terms. Lenardo filed his notice of appeal on May 5, 1975. On June 23, 1975, while the appeal was pending, the United States Supreme Court decided *United States v. Hale, supra.* The Third Circuit ordered the case remanded, for consideration in light of *Hale,* on February 2, 1976. The United States Supreme Court rendered its decision in *Doyle v. Ohio, supra,* on June 17, 1976. This Court must now consider the retroactivity problem.

In *Desist v. United States,* 394 U.S. 244, 249, 89 S.Ct. 1030, 22 L.Ed.2d 248 (1969), the Court noted that retroactivity is a function of three factors, first formulated in *Linkletter v. Walker,* 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965), and fully articulated in *Stovall v. Denno,* 388 U.S. 293, 297, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967):

> ". . . (a) the purpose to be served by the new standards, (b) the extent of the reliance by law enforcement authorities on the old standards, and (c) the effect on the administration of justice of a retroactive application of the new standards."

The Court in *Desist* observed that "[f]oremost among these factors is the purpose to be served by the new" standards. 394 U.S.

at 249, 89 S.Ct. at 1033. If the purpose of the new standards is to ensure "fairness of the trial" or "the very integrity of the fact-finding process," *Linkletter v. Walker, supra,* 381 U.S. at 639, 85 S.Ct. at 1743, the Court will apply the standards retroactively, unless the other factors strongly suggest a contrary result.

However, our courts apply new standards not only completely retrospectively or completely prospectively, but, at times, somewhere in between.

Strictly speaking, when the Supreme Court announces a new rule, interpretation, or standard, if it applies that rule, interpretation, or standard to the litigants then before it, the Court is applying the rule retroactively.

In *Linkletter v. Walker, supra,* 381 U.S. at 621–22, 85 S.Ct. at 1733, the Court noted that a "ruling which is purely prospective does not apply even to the parties before the court. See, e. g., *England v. Louisiana State Board of Medical Examiners,* 375 U.S. 411 [84 S.Ct. 461, 11 L.Ed.2d 440] (1964)." Rarely does the Court apply a rule purely prospectively so as to deny the litigants, who successfully challenged the old standard, the benefit of their endeavors. In fact, purely prospective application of new standards is in disfavor. I can find no criminal procedure cases since *Linkletter* where a rule was purely prospectively applied.

A court may also apply a new rule to cases pending on direct appeal at the time the new standard is enunciated. This is what is called partial retroactivity. The reasoning here is that those who raise the issue contemporaneously with the litigant who successfully challenged the old standard should not be denied the application of the new standard just because they were not fortunate enough to have their appeal litigated first.

Lastly, there is complete retroactive application, which means that the court applies the new standard to all cases whenever decided.[1]

---

1. This includes cases final at the time the new standard is formulated. The Court in *Linkletter* defined "final" in these terms: "By final we

mean where the judgment of conviction was rendered, the availability of appeal exhausted, and the time for petition for certiorari had

The Supreme Court applied the new rule to the defendants, Hale and Doyle, who raised them. Therefore, the Court has made clear that it does not wish to apply the new standard purely prospectively.

Defendant argues that *Hale* should be applied to all cases on direct appeal when *Hale* was decided. He asserts that the general rule is that all new standards are applied partially retroactively, that is, new standards are applied to all cases on direct appeal at the time the new standards are announced.

However, there is a line of cases starting with *Johnson v. New Jersey,* 384 U.S. 719, 732, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966), which suggest that the *Linkletter* test makes no distinction between partial and full retroactive application. *See, Desist v. United States, supra,* 394 U.S. 244, 89 S.Ct. 1048, 22 L.Ed.2d 248. This test would require ad hoc determinations of retroactivity for cases on direct appeal when the new standard is announced as well as for cases already final. The distinction between partial and full retroactive application would then become a matter of degree.

Defendant's argument is based on several civil cases, all of which rely on Chief Justice Marshall's opinion in *United States v. Schooner Peggy,* 5 U.S. (1 Cranch) 103, 110, 2 L.Ed. 49 (1801), wherein he stated:

> "It is in the general true that the province of an appellate court is only to enquire whether a judgment when rendered was erroneous or not. But if subsequent to the judgment and before the decision of the appellate court, a law intervenes and positively changes the rule which governs, the law must be obeyed, or its obligation denied . . . [and] where individual rights . . . are sacrificed for national purposes . . . the court must decide according to existing laws, and if it be necessary to set aside a judgment . . . which cannot be af-

firmed but in violation of law, the judgment must be set aside."

This principle was interpreted to mean that a court must apply whatever new standard is formulated to cases pending on appeal because the new standard *is* the law.

The principle was commented upon in *Linkletter v. Walker, supra,* wherein the Court traced the common law treatment of the concept of retroactivity. According to the *Linkletter* opinion, in the common law all new rules were given retroactive application at first. Later, courts began to realize that those who relied on the old standard or rule were thereby prejudiced. Thus, prospective applications began to occur. *See discussion in Linkletter v. Walker, supra,* 381 U.S. at 622–629, 85 S.Ct. 1731.

Cases on direct appeal at the time a new standard was formulated enjoyed the application of the new standard despite prospective application to cases final at the time the new standard was formulated. Both civil and criminal cases followed that rule. *E. g., United States v. Chambers,* 291 U.S. 217, 54 S.Ct. 434, 78 L.Ed. 763 (1964). In fact, the Court in *Linkletter* observed "[t]hat no distinction was drawn between civil and criminal litigation . . . ." 381 U.S. at 627, 85 S.Ct. at 1736. *See also, James v. United States,* 366 U.S. 213, 81 S.Ct. 1052, 6 L.Ed.2d 246 (1961). In *Linkletter,* 381 U.S. at 627, 85 S.Ct. at 1736, the Court concluded that "[u]nder our cases it appears (1) that a change in law will be given effect while a case is on direct review."

The *Linkletter* Court declined to give complete retroactive effect to *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) (due process requires that evidence obtained in violation of defendant's Fourth Amendment rights is inadmissible at trial), but it noted that previous cases had applied the *Mapp* exclusionary rule to cases on direct appeal at the time *Mapp* was decided.[2]

---

elapsed before our decision in *Mapp v. Ohio* [367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081]." 381 U.S. at 622 n. 5, 85 S.Ct. at 1734.

2. The holding in *Linkletter* was confined to the question of cases final at the time *Mapp* was decided, because that was the question before the Court and because the question of partial retroactivity was already decided.

*Linkletter v. Walker, supra,* 381 U.S. at 622 n. 4, 85 S.Ct. 1731. *E. g., Ker v. California,* 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963); *Fahy v. Connecticut,* 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963); *Stoner v. California,* 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964).

However, the *Linkletter* Court, after concluding its review of the common law, decided that the present rule would be different. The Court said, "[t]hus, the accepted rule *today* is that in appropriate cases the Court may in the interest of justice make the rule prospective." (Emphasis added.) 381 U.S. at 628, 85 S.Ct. at 1737. It added that even new rules which were constitutionally compelled did not require a different result. "However, we believe that the Constitution neither prohibits nor requires retrospective effect. As Justice Cardozo said, 'We think the Federal Constitution has no voice upon the subject.'" 381 U.S. at 629, 85 S.Ct. at 1736.

It is not clear from that language whether the Court was implying that the present rule with regard to prospective applications of new standards applied to cases on direct review as well.

In *O'Connor v. Ohio,* 382 U.S. 286, 86 S.Ct. 445, 15 L.Ed.2d 337 (1965), a short per curiam opinion, the Court applied without explanation the new standard of *Griffin v. California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965) (prosecutor may not comment on defendant's failure to testify), to cases pending on direct appeal when *Griffin* was decided, while *Tehan v. Shott,* 382 U.S. 406, 86 S.Ct. 459, 15 L.Ed.2d 453 (1966), denied complete retroactive application to the *Griffin* no-comment rule.

However, beginning with *Johnson v. New Jersey, supra,* 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 the Court "abandoned the approach [of giving effect to new standards to cases pending on appeal at the time] taken in *Linkletter* and *Tehan* and concluded that 'there are no jurisprudential or constitutional obstacles' to the adoption of a different cut-off point." *Desist v. United States, supra,* 394 U.S. at 252, 89 S.Ct. at 1035 (citing

*Johnson v. New Jersey, supra,* 384 U.S. at 733, 86 S.Ct. 1772).

In *Johnson* the Court, after deciding that the rules in *Escobedo v. Illinois,* 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), and *Miranda v. Arizona, supra,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (defendant in custody must be given specific warnings advising him of his Fifth Amendment privilege against self-incrimination), would not be applied retroactively, stated (384 U.S. at 732, 86 S.Ct. at 1780):

> "The question *remains* whether *Escobedo* and *Miranda* shall affect cases still on direct appeal when they were decided or whether their application shall commence with trials begun after the decisions were announced. Our holdings in *Linkletter* and *Tehan* were necessarily limited to convictions which had become final by the time *Mapp* and *Griffin* were rendered. Decisions prior to *Linkletter* and *Tehan* had already established without discussion that *Mapp* and *Griffin* applied to cases still on direct appeal at the time they were announced. See 381 U.S. at 622 and n. 4 [85 S.Ct. at 1731]; 382 U.S. at 409, n. 3 [86 S.Ct. [459] at 461]. *On the other hand, apart from the application of the holdings in Escobedo and Miranda to the parties before the Court in those cases, the possibility of applying the decisions only prospectively is yet an open issue.*" (Emphasis added.)

The Court concluded that for the same reasons it declined to apply the *Miranda* and *Escobedo* rules to final cases, it would decline to apply them to cases on direct appeal when those decisions were rendered.

The Court added that the "introductory discussion in *Linkletter,* and the cases cited therein, have made it clear that there are no jurisprudential or constitutional obstacles to the rule we are adopting here. See 381 U.S. at 622–29 [85 S.Ct. [1731], at 1733–1737]." *Id.* at 733, 86 S.Ct. at 1781. In both *England v. Louisiana State Board of Medical Examiners, supra,* 375 U.S. 411, 84 S.Ct. 461, 11 L.Ed.2d 440 and *James v. United States, supra,* 366 U.S. 213, 81 S.Ct. 1052, 6 L.Ed.2d 246, the Court had declined

to apply a new standard to cases pending on direct appeal at the time. In *Stovall v. Denno, supra,* 388 U.S. at 301, 87 S.Ct. 1967 (where the Court concluded that the right to counsel at a lineup, *United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), and *Gilbert v. California,* 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967), should not be applied retroactively), the Court found no reason to distinguish the cases on direct appeal. For the same reasons it declined to apply the new standard to cases already final, it declined to apply those new standards to cases then pending on appeal.

The rule in criminal procedure cases with respect to cases pending on direct appeal at the time a new standard is formulated is the same as that employed for cases already final. *See, United States v. Peltier,* 422 U.S. 531, 95 S.Ct. 2313, 45 L.Ed.2d 374 (1975). The civil cases cited by defendant do not indicate a different rule.

In *Thorpe v. Housing Authority of the City of Durham,* 393 U.S. 268, 282–83, 89 S.Ct. 518, 21 L.Ed.2d 474 (1969), the Court relying on *Schooner Peggy, supra,* 5 U.S. 103, applied an administrative agency's change in the law to cases pending appeal when the change was made because it furthered the act's remedial purpose. The Court did note that the general principle of application of new standards to cases pending on appeal at the time of the change would be followed where there was no manifest injustice in doing so. *Accord, Bradley v. Richmond School Board,* 416 U.S. 696, 717, 94 S.Ct. 2006, 2019, 40 L.Ed.2d 476 (1974), where the Court stated that the test for manifest injustice would require an analysis of "(a) the nature and identity of the parties, (b) the nature of their rights, and (c) the nature of the impact of the change in law upon those rights." In *Hamling v. United States,* 418 U.S. 87, 103, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974), the Court applied the new obscenity standards of *Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1974), to a case on direct appeal when *Miller* was decided, but found that it did not materially change the

result and therefore affirmed the conviction of mailing and conspiring to mail obscene materials.

These cases, I find, do not change the holding in the *Johnson* line of cases. Prospective application is the exception to the rule, but it is an ever-growing exception. In fact, at this point the exception may be more the rule than the rule. The two lines of cases can be harmonized by a finding that in criminal cases, where the application of new standards can often open floodgates to the detriment of society, for policy reasons courts should apply the *Stovall v. Denno* three-pronged test. Where the purpose of the rule, the reliance upon the old rule, and the burden on the administration of criminal justice all indicate that retroactive application, even partial retroactive application, may work a "manifest injustice," such retroactive application must be denied.

In civil cases the test for manifest injustice is similar to that employed in criminal cases. However, the Court has made it clear that the *Linkletter-Stovall* test should be applied even for cases on direct appeal at the time the new standard is articulated. Even the *Thorpe* line of cases does not indicate a per se rule, but rather employs a test not inconsistent with that used in *Linkletter* and *Stovall.*

Defendant's contention that the *Thorpe* line of cases requires automatic application of a new rule to cases then pending on appeal is not the law. This Court is convinced that it must and should apply the *Linkletter* and *Stovall* test. As the Court in *Stovall v. Denno, supra,* 388 U.S. at 301, 87 S.Ct. at 1972, noted:

> "Inequity arguably results from according the benefit of a new rule to the parties in the case in which it is announced but not to other litigants similarly situated in the trial or appellate process who have raised the same issue. *But we regard the fact that the parties involved are chance beneficiaries as an insignificant cost for adherence to sound principles of decision-making."* (Emphasis added.)

As I noted above, the *Linkletter-Stovall* test for cases on direct appeal is the same as for cases already final.[3] Therefore, this Court will proceed to examine cases which have employed the three-pronged test.

Our first inquiry must be directed to the purpose of the new rule. In *Linkletter* the new rule was prophylactic. The exclusionary rule was intended to deter police from violating defendants' Fourth Amendment rights and to protect judicial integrity. The rule had no bearing on the truth-finding process. The Court stated that "[i]n so holding, we relied in part on the fact that the rule affected evidence 'the reliability and relevancy of which is not questioned.' [*Linkletter v. Walker, supra*] 381 U.S., at 639 [85 S.Ct. [1731], at 1743]." *Johnson v. New Jersey, supra*, 384 U.S. at 727, 86 S.Ct. at 1777.

Similarly, the Court has denied retroactive application to other Fourth Amendment exclusionary rule cases. *E. g., Williams v. United States*, 401 U.S. 646, 91 S.Ct. 1148, 28 L.Ed.2d 388 (1971) (denying retroactivity to *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), which stated that a search incident to arrest may only extend to the area within defendant's reach); *Desist v. United States, supra*, 394 U.S. 244, 89 S.Ct. 1030, 22 L.Ed.2d 248 (denying retroactivity to *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), which stated that a search need not be trespassory; *United States v. Peltier, supra*, 422 U.S. 531, 95 S.Ct. 2313, 45 L.Ed.2d 374 (denying retroactivity to *Almeida-Sanchez v. United States*, 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973), which limited border searches to the area near the border).

Nor has the Court determined the right to trial by jury to be retroactive, because there was no indication that a trial by a judge was less reliable than trial by jury. Therefore, the purpose of the new standard did not require new trials. *De Stefano v.*

*Woods*, 392 U.S. 631, 88 S.Ct. 2093, 20 L.Ed.2d 1308 (1968) (which declined to give retroactive effect to *Duncan v. Louisiana*, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968), right to trial by jury, and *Bloom v. Illinois*, 391 U.S. 194, 88 S.Ct. 1477, 20 L.Ed.2d 522 (1968), right to jury trial in criminal contempt cases).

Nor was double jeopardy which was extended to the States in *North Carolina v. Pearce*, 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969), given retroactive effect in *Michigan v. Payne*, 412 U.S. 47, 93 S.Ct. 1966, 36 L.Ed.2d 736 (1973), again because the purpose of the rule had no bearing on the fact-finding process. *See also, Fuller v. Alaska*, 393 U.S. 80, 89 S.Ct. 61, 21 L.Ed.2d 212 (1968) (refusing to give retroactive effect to *Lee v. Florida*, 392 U.S. 378, 88 S.Ct. 2096, 20 L.Ed.2d 1166 (1968), which prohibited use of evidence obtained in violation of § 605 Federal Communications Act). *See also, Hill v. California*, 401 U.S. 797, 91 S.Ct. 1106, 28 L.Ed.2d 484 (1971); *Jenkins v. Delaware*, 395 U.S. 213, 89 S.Ct. 1677, 23 L.Ed.2d 253 (1969).

In *Johnson v. New Jersey, supra,* discussed above, the Court declined to give retroactive effect to *Miranda* and *Escobedo* because the purpose of those rules did not require new trials. The Court reasoned that defendants could still argue that their confessions were coerced, if the facts demonstrated that this was so. The purpose of *Miranda* and *Escobedo* was to "guard against the possibility of unreliable statements in every instance of in-custody interrogation, they encompass situations in which the danger is not necessarily as great as when the accused is subjected to overt and obvious coercion." 384 U.S. at 730, 86 S.Ct. at 1779. The Court added, "[t]hus while *Escobedo* and *Miranda* provide important new safeguards against the use of unreliable statements at trial, the nonretroactivity of these decisions will not preclude persons whose trials have already been completed from invoking the same safeguards

---

**3.** The Third Circuit in *United States v. Zirpolo*, 450 F.2d 424 (3d Cir. 1971), applied a new standard with regard to grand jury selection of males and females to cases on direct appeal,

but not retroactively to cases already final. The court did not announce a rationale for this distinction.

**1154**

as part of an involuntariness claim." *Id.* at 730, 86 S.Ct. at 1779.

However, this Court believes that both strong reliance and burden arguments led the Court to deny retroactivity to *Miranda* and *Escobedo.* In *U. S. ex rel. Allison v. State of New Jersey,* 418 F.2d 332, 336 (3rd Cir. 1969), the court observed that "[i]f retroactive application to cases preceding enunciation of the rule would not serve to further its purpose, this factor weighs heavily against retroactivity. Conversely, if the underlying purpose of the rule would be implemented, retroactive application is indicated *unless the impact of one of the other criteria is so strong as to bar such application.*" (Emphasis added.) The Court in *Johnson* said, "[w]e here stress that the choice between retroactivity and nonretroactivity in no way turns on the value of the constitutional guarantee involved. . . . To reiterate what was said in *Linkletter,* we do not disparage a constitutional guarantee in any manner by declining to apply it retroactively." *Id.,* 384 U.S. at 728, 86 S.Ct. at 1778.

Another instructive case denying retroactive application is *Tehan v. Shott, supra.* There the Court considered whether *Griffin v. California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), which prohibited prosecutorial comment on a defendant's failure to take the stand, should be applied retroactively. In examining the purpose of the *Griffin* rule, the Court observed that there was no clear purpose as there had been in *Linkletter.* The Court stated (382 U.S. at 414, 86 S.Ct. at 464):

> "It follows that the 'purpose' of the *Griffin* rule is to be found in the whole complex of values that the privilege against self-incrimination itself represents, values described in the *Malloy* [*v. Hogan,* 378 U.S. 1, 7–8, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964) (extending the privilege against self-incrimination to the States)] case as reflecting 'recognition that the American system of criminal prosecution is accusatorial, not inquisitorial, and that the Fifth Amendment privilege is its essential mainstay . . .

Governments, state and federal, are thus constitutionally compelled to establish guilt by evidence independently and freely secured, and may not by coercion prove a charge against an accused out of his own mouth.'"

The Court added, however, that the purpose of "the Fifth Amendment's privilege against self-incrimination is not an adjunct to the ascertainment of truth. That privilege, like the guarantees of the Fourth Amendment, stands as a protection of quite different constitutional values—values reflecting the concern of our society for the right of each individual to be let alone. To recognize this is no more than to accord those values undiluted respect." 382 U.S. at 416, 86 S.Ct. at 465. The Court again focused on both reliance and burden factors in denying retroactive application.

Despite the language in *Tehan* that the Fifth Amendment privilege against self-incrimination did not go to the truth-finding process, the Court obviously believed that prosecutorial comment on a defendant's exercise of that privilege might influence a jury adversely. It might cloud the jury's vision of the facts and may result in a verdict based on conjecture. The jury may infer that the defendant refused to testify because he wanted to hide the truth. The prosecutor's comments would add official sanction to that belief. In *Griffin v. California, supra,* 380 U.S. at 614, 85 S.Ct. at 1233, where the rule originated, the Court concluded that comment on the defendant's failure to take the stand "cuts down on the privilege by making its assertion costly."

The Court in *Tehan* did not spell this out in its opinion, but in *Johnson v. New Jersey, supra,* 384 U.S. at 729, 86 S.Ct. at 1778, the Court made it clear what its reasoning had been in *Tehan:*

> "On the other hand, we denied retroactive application to *Griffin v. State of California, supra,* despite the fact that comment on the failure to testify may sometimes mislead the jury concerning the reasons why the defendant has refused to take the witness stand. We are

thus concerned with a question of probabilities and must take account, among other factors, of the extent to which other safeguards are available to protect the integrity of the truth-determining process at trial."

The *Johnson* Court added that "[f]inally, we emphasize that the question whether a constitutional rule of criminal procedure does or does not enhance the reliability of the fact-finding process at trial is necessarily a matter of degree." 384 U.S. at 728–29, 86 S.Ct. at 1778.

Another case denied full retroactive application was *Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). In a short per curiam opinion, and without discussion, the Supreme Court applied the exclusionary rule of *Massiah* (where the Court ruled that incriminating statements made by an indicted defendant to a co-defendant, who later testified for the State and who wore a bugging device so agents could listen to defendant's conversation, were inadmissible as a violation of defendant's right to counsel), to cases on direct appeal when *Massiah* was decided. *McLoud v. Ohio,* 381 U.S. 356, 85 S.Ct. 1556, 14 L.Ed.2d 682 (1965). Since *McLoud* was a pre-*Johnson* case, the automatic partial retroactivity rule was probably applied. However, in *United States ex rel. Allison v. State of New Jersey, supra,* 418 F.2d 332, the Third Circuit declined to apply *Massiah* completely retroactively.

The Third Circuit, like the Supreme Court, focused primarily on the purpose factor. The court stressed that the purpose of the rule in *Massiah* was to protect privacy and not the truth-finding process. Statements obtained in violation of *Massiah* were not less truthful or reliable than those which were obtained in accordance with it.

Like *Mapp,* the purpose of the rule did not require retroactive application.

In all of the above cases, the Court refused to apply the new standard retroactively because the purpose of the new standard did not require it.[4] Or if the purpose would have been furthered by retroactive application, then the Court declined to apply it retroactively if the other factors were sufficiently strong to overcome the benefits of furtherance of the purpose of the rule.

The Court has also found in many instances that the purpose of the rule requires retroactive application. Oftentimes the Court has viewed the purpose factor to be so strong as to overcome strong reliance and burden factors. This was the case in many of the right-to-counsel decisions.

The Court has found that the right to counsel was so basic to a fair trial and to the integrity of the fact-finding process that there was a need to apply the right to counsel at trial, *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), retrospectively, *Doughty v. Maxwell,* 376 U.S. 202, 84 S.Ct. 702, 11 L.Ed.2d 650 (1964). Similarly the Court found the right to counsel on appeal, *Douglas v. California,* 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963), deserved retroactive application, *Smith v. Crouse,* 378 U.S. 584, 84 S.Ct. 1929, 12 L.Ed.2d 1039 (1964). Subsequently counsel rights at parole revocation, *Mempa v. Rhay,* 389 U.S. 128, 88 S.Ct. 254, 19 L.Ed.2d 336 (1967), and at probable cause hearings, *White v. Maryland,* 373 U.S. 59, 83 S.Ct. 1050, 10 L.Ed.2d 193 (1963), and *Hamilton v. Alabama,* 368 U.S. 52, 82 S.Ct. 157, 7 L.Ed.2d 114 (1961), were given retroactive application for the same reasons. *See, McConnell v. Rhay,* 393 U.S. 2, 89 S.Ct. 32, 21 L.Ed.2d 2 (1968); *Arsenault v. Massachusetts,* 393 U.S. 5, 89 S.Ct. 35, 21 L.Ed.2d

---

**4.** However, in *Robinson v. Neil,* 409 U.S. 505, 93 S.Ct. 876, 35 L.Ed.2d 29 (1973), Justice Rehnquist noted that in cases where a procedural rule is not involved, the *Linkletter-Stovall* tests, which require an inquiry into the purpose of the rule and whether the rule goes to the truth-finding process, are inapplicable. Justice Rehnquist noted that *Furnman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972)

(prohibiting jury discretion in imposing the death penalty), did not involve a rule that influenced the truth-finding process, but was, nonetheless, applied retroactively in *Walker v. Georgia,* 408 U.S. 936, 92 S.Ct. 2845, 33 L.Ed.2d 753 (1972). But, in the *Hale-Doyle* rule, a procedural rule is involved and there is, therefore, no problem with applying the *Linkletter-Stovall* analysis.

5 (1968). Counsel, the Court has observed, is crucial to establishing the facts and to the preparation of a defense. A fair trial depends on the ability of both sides to present the facts and make arguments that only trained counsel can effectively make. In an adversarial system, such as ours, the right to counsel is fundamental to a fair trial.

But in *Stovall v. Denno, supra,* the Court declined to find the right to counsel at a lineup retroactive. The Court stated (388 U.S. at 298–99, 87 S.Ct. at 1971):

> "It must be recognized, however, that, unlike cases in which counsel is absent at trial or on appeal, it may confidently be assumed that confrontations for identification can be and often have been conducted in the absence of counsel with scrupulous fairness and without prejudice to the accused at trial."

The Court also emphasized both the reliance and burden factors which it found militated against a finding of retroactivity. The purpose of counsel at the lineup stage was not so fundamental to reliable evidence being introduced at trial as to mandate a finding of retroactivity.

In *Berger v. California,* 393 U.S. 314, 89 S.Ct. 540, 21 L.Ed.2d 508 (1969), the Court retroactively applied *Barber v. Page,* 390 U.S. 719, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968) (the absence of a witness from the jurisdiction does not justify the use at trial of his preliminary hearing testimony unless he is unavailable and the prosecution has made a good-faith effort to obtain him). The purpose of the *Barber* rule was to ensure effective cross-examination which the Court found did go to the reliability of the fact-finding process and to a fair trial. The Court also added that the new standard had been anticipated by *Pointer v. Texas,* 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965), which militated against a finding of reliance on the old standard.

In *Roberts v. Russell,* 392 U.S. 293, 88 S.Ct. 1921, 20 L.Ed.2d 1100 (1968), the Court retroactively applied *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). *Bruton* held that a codefendant's confession implicating the defendant which is offered at defendant's trial and where there is no opportunity to cross-examine the codefendant is reversible error. Despite strong reliance and burden arguments, the Court found that the purpose of the rule was so important as to override those other factors.

The Supreme Court in *McNerlin v. Denno,* 378 U.S. 575, 84 S.Ct. 1933, 12 L.Ed.2d 1041 (1964), also thought that the rule in *Jackson v. Denno,* 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964) (which prohibited the New York procedure permitting the question of voluntariness of a confession to be decided by a jury), should be applied retroactively because it went to the fact-finding process and because of its purpose. *See also, Eskridge v. Washington Prison Board,* 357 U.S. 214, 78 S.Ct. 1061, 2 L.Ed.2d 1269 (1958) (per curiam opinion applying retroactively *Griffin v. Illinois,* 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956), right to free trial transcript for indigent appellants); *Ivan v. City of New York,* 407 U.S. 203, 92 S.Ct. 1951, 32 L.Ed.2d 659 (1972) (gave full retroactivity to the *In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), proof beyond a reasonable doubt standard at juvenile hearings). These last two cases involved matters supportive of the truth-finding process.

With these cases in mind, this Court now looks to the purpose of both *Hale* and *Doyle.*

*Hale* prohibits the use of a defendant's silence at the time of his arrest as an inconsistent statement with which to impeach his exculpatory trial testimony. *Hale* was decided under the Supreme Court's supervisory power. The Court found that a defendant's silence after being given *Miranda* warnings is not inconsistent with innocence. Silence is, at best, ambiguous. The Court found that an arrestee "is under no duty to speak and, as in this case, has ordinarily been advised by government authorities only moments earlier that he has a right to remain silent, and that anything he does say can and will be used against him in court." 422 U.S. at 176, 95 S.Ct. at 2136.

The Court made a finding that, as a basic principle of evidence, silence in light of *Miranda* warnings has little probative value.

The fact that the Court did not reach the constitutional issue, but based its opinion on nonconstitutional grounds, does not bear on the question of retroactivity. The purpose of the *Hale* rule was to ensure that only probative evidence would be used at trial. The Court feared that innocent persons who might have refrained from giving exculpatory testimony at the time of their arrest because of reliance on their Fifth Amendment privilege against self-incrimination would be convicted.

Undoubtedly the Court in *Hale* was concerned about ensuring a fair trial. The *Hale* rule focuses on the integrity and reliability of the fact-finding process. Therefore, under the first prong of the *Linkletter-Stovall* test, the purpose to be served by the rule would tend to suggest that retroactive application was required.

In *Doyle v. Ohio, supra,* the Supreme Court considered the constitutional question left open in *Hale.* In *Doyle* the Court concluded that the *Hale* rule was compelled by the due process clause of the Fourteenth Amendment. *See, Doyle v. Ohio,* 426 U.S. p. 619, 96 S.Ct. 2240.

*Doyle* reinforces the Court's opinion that the *Hale* rule was intended to go to the truth-finding process. If the Supreme Court had relied upon Fifth Amendment grounds instead of due process grounds, it would have been closer in rationale to the rules announced in *Griffin v. California, Miranda,* and *Escobedo,* all of which were denied retroactive application. The *Miranda* and *Escobedo* rules went to pretrial conduct. The Court in denying retroactive application stated that there were other means of attacking Fifth Amendment infringements, such as attacking the confessions as coerced. If the confession was not

coerced, but the defendant was merely denied a warning, the truthfulness of the confession would not be undermined.

In *Tehan v. Shott, supra,* 382 U.S. 406, 86 S.Ct. 459, 15 L.Ed.2d 453, the Court denied retroactive effect to *Griffin* because the purpose of the rule, although not clear, was in part to protect the individual's right not to convict himself. Yet, a violation of that right would not go to the truth or reliability of the facts. The Court in *Johnson* discussed *Tehan,* noting that there were also inferences that the jury could draw because of the defendant's silence and the prosecutor's statements, both of which would affect truth-finding and the reliability of the evidence. However, the Court felt other factors outweighed any benefit retroactive application might have on the purpose for the rule.

The *Hale* rule does go to the truth-finding process, more so than did the rules in *Miranda* and *Escobedo.* This Court believes that the *Johnson* decision, which discussed the *Tehan* rationale, more accurately reflects the purpose of the *Griffin* rule, which admittedly is similar in import and purpose to the one in *Hale.* Both rules are concerned with adverse and prejudicial inferences that might be drawn, in fact are intended to be drawn, by the jury. In both situations, a defendant may be perfectly innocent and yet, because of the prosecutor's use of the defendant's silence and the inferences to be drawn therefrom, may be convicted. The Court believes that the *Hale* rule has as much bearing on the truth-finding process as other rules which have been applied retroactively. See discussion above. This Court can only conclude that the purpose of the *Hale* and *Doyle* rule would be furthered by retroactive application, especially for cases on direct appeal when *Hale* was decided.[5]

The Government contends, however, that despite the fact that the rule may influence

---

**5.** One important consideration in retroactivity questions is the extent to which other safeguards are present for the protection of the right involved. In cases involving the *Hale* rule, the defendant can explain his silence, but

the Court has found that such a safeguard is not sufficient in light of the nature of the ambiguity of silence, *see, United States v. Hale, supra,* and in light of the due process right involved, *see, Doyle v. Ohio, supra.*

the fact-finding process, the reliance factor outweighs any benefits that might be incurred by retroactive application.

Reliance, as that term is used in the *Linkletter* test, means the extent to which the old standard was relied upon by police or the prosecution. The extent of universal application of the standard throughout the country, absence of challenges to the old standard, and clarity of statement and soundness of reasoning are all factors that are examined.

The old standard before *Hale* was far from uniform. The Circuits were split on the issue. Some permitted impeachment of the defendant's trial testimony with his silence in the face of accusation or questioning after receiving *Miranda* warnings, *United States ex rel. Burt v. State of New Jersey,* 475 F.2d 234 (3d Cir. 1973), *cert. denied,* 414 U.S. 938, 94 S.Ct. 243, 38 L.Ed.2d 165 (1973); *United States v. Ramirez,* 441 F.2d 950 (5th Cir. 1971), *cert. denied,* 404 U.S. 869, 92 S.Ct. 91, 30 L.Ed.2d 113 (1971);[6] *Sims v. Slayton,* 333 F.Supp. 246 (W.D.Va.1971), while others did not, *United States v. Anderson,* 162 U.S.App. D.C. 305, 498 F.2d 1038 (1974), *aff'd, United States v. Hale,* 422 U.S. 171, 95 S.Ct. 2133, 45 L.Ed.2d 99 (1975); *Johnson v. Patterson,* 475 F.2d 1066 (10th Cir. 1973), *cert. denied,* 414 U.S. 878, 94 S.Ct. 64, 38 L.Ed.2d 124 (1973); *United States v. Semensohn,* 421 F.2d 1206 (2d Cir. 1970); *United States v. Brinson,* 411 F.2d 1057 (6th Cir. 1969); *Fowle v. United States,* 410 F.2d 48 (9th Cir. 1969); *Fagundes v. United States,* 340 F.2d 673 (1st Cir. 1965). By far, the majority of Circuits prohibited use of silence at arrest as an inconsistent statement with which to impeach a defendant's trial testimony.

In the Third Circuit, where it was permitted, the law was not without challenge, nor was the law clear or fully settled. The case in the Third Circuit which laid down the rule on this question was *United States ex rel. Burt v. State of New Jersey,* 475 F.2d

234 (3d Cir.), *cert. denied,* 414 U.S. 938, 94 S.Ct. 243, 38 L.Ed.2d 165 (1973).

*Burt* was a per curiam opinion with Judge Rosenn writing a concurring opinion in which Judge Van Dusen joined. The per curiam obviously represented only Judge McLaughlin's reasoning, because the concurring opinion represented the reasoning of two of the three judges on the panel.

Judge McLaughlin stated that when Burt was arrested, he was arrested for breaking and entering. After his arrest, the police found a gun on him. Later, the police determined that Burt had shot and killed a man. Burt was charged with murder and eventually convicted. At trial the prosecutor had used the fact that the defendant, who claimed he shot the victim accidentally, failed to go for help or tell anyone that he shot the victim accidentally. Judge McLaughlin reasoned that such cross-examination which was aimed at impeaching the defendant's credibility was permissible because the defendant's *conduct* was inconsistent with the actions of an innocent man. He added, "[t]here was no reason for him not to comment on the allegedly accidental shooting." 475 F.2d at 236. The Judge concluded that this was not a case where the defendant was claiming his privilege against self-incrimination in the face of police accusation as was the case in *Miranda.*

This holding had been interpreted, even in our Circuit, as standing for the proposition that a defendant's silence at the time of his arrest could be used to impeach his trial testimony if that silence was inconsistent with innocence and was related to a crime other than that for which he was arrested. *United States v. Holland,* 360 F.Supp. 908 (E.D.Pa.1973), *aff'd without opinion,* 487 F.2d 1395 (3d Cir. 1973).

Judge Rosenn's concurrence relied upon *Harris v. New York,* 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), which permitted impeachment of a defendant's testimony with statements secured in violation of the

---

**6.** *See also, United States v. Fairchild,* 505 F.2d 1378 (5th Cir. 1975); *United States v. Harp,* 513 F.2d 786 (5th Cir. 1975), remanded for

reconsideration in light of *Hale,* 423 U.S. 919, 96 S.Ct. 258, 46 L.Ed.2d 246 (1976).

defendant's *Miranda* rights. Judge Rosenn stated (475 F.2d at 237–38):

"I perceive no difference between impeachment by prior inconsistent statements made in the absence of a *Miranda* warning and impeachment by prior silence inconsistent with trial testimony which justifies not applying the *Harris* rationale in the present case. *Accord, United States v. Ramirez,* 441 F.2d 950 (5th Cir. [1971]), *cert. denied,* 404 U.S. 869 [92 S.Ct. 91, 30 L.Ed.2d 113] (1971)."

He added that *Griffin v. California, supra,* presented no bar to this rule because *Griffin* does not, in light of *Harris,* apply to impeachment. Besides, he noted, the defendant is always free to explain away inconsistencies.

In *Agnellino v. State of New Jersey,* 493 F.2d 714 (3d Cir. 1974), the court once again confronted this issue. This time a different panel issued three separate opinions.

In *Agnellino* the defendant was convicted of receiving stolen property, carpeting and air conditioners. At the time of his arrest he said, according to police, he "had a good buy" on the carpeting. Police said he told them he spent $150 per air conditioner and added, "[f]or that price I wouldn't be surprised" if they were stolen. 493 F.2d at 715. Agnellino disputed this last statement. At trial he testified that he had purchased these items as part of a legitimate and usual course of business transaction.

On summation the prosecutor stated, in what the trial court termed fair comment, that he knew what he would do if the police came to him, he would say, "let's go and see the man who sold me the merchandise." The implication the prosecutor tried to make was that the defendant's silence or failure to give the exculpatory explanation that he offered at trial was evidence of fabrication.

Judge Hunter, relying on Judge Rosenn's rationale in *Burt* and on *Harris v. New York, supra,* stated (493 F.2d at 716):

"Recently, however, the Supreme Court emphasized that '[i]t does not follow from *Miranda* that evidence inadmissible

against an accused in the prosecution's case in chief is barred for all purposes.' *Harris v. New York,* 401 U.S. 222, 224 [91 S.Ct. 643, 645, 28 L.Ed.2d 1] (1970)."

Once the defendant testifies, he waives his Fifth Amendment privilege and is subject to impeachment, reasoned Judge Hunter. He added that the two statements, the one told to the police and the other offered at trial, were not inconsistent. What is crucial here, he stated, is not what was said which was inconsistent, but what was *not* said.

Judge Hunter explained (493 F.2d at 718):

"Viewed in this manner, the question confronting us is whether the 'prior inconsistent statement' rationale of *Harris* should be extended to permit impeachment by comment on appellant's silence at time of arrest. Perceiving no difference between the two, this Court held in *United States ex rel. Burt v. New Jersey,* 475 F.2d 234 (3d Cir. 1973), that *Harris* extends to impeachment by prior inconsistent silence. . . .

. . . While the two opinions in *Burt* emphasize different considerations in arriving at this result, both opinions cited with approval the view expressed by the Fifth Circuit that *Harris* applies to impeachment by prior silence inconsistent with trial testimony. *United States v. Ramirez,* 441 F.2d 950 (5th Cir.), cert. den., 404 U.S. 869 [92 S.Ct. 91, 30 L.Ed.2d 113] (1971)."

He added:

"Notwithstanding this reference to *Ramirez,* there is language in Judge McLaughlin's per curiam opinion which might suggest that the holding of *Burt* is limited only to impeachment by prior inconsistent silence which *does not occur in the face of police accusation.* This limitation apparently was thought to be required by the language in *Miranda* that 'the prosecution may not use at trial the fact that someone stood mute or claimed his privilege *in the face of accusation.*'"

However, Judge Hunter observed (*id.* at 719):

". . . The clear import of the majority [Judge Rosenn's] opinion is that in light of *Harris,* silence, *even in the face of police suspicion* [emphasis added], may be used for *impeachment* purposes once an accused has freely taken the stand in his own behalf."

According to Judge Hunter's opinion, silence that could be used to impeach the defendant's trial testimony could be silence in the face of police accusations about the crime for which the defendant was arrested.[7]

Judge Seitz concurred in *Agnellino.* In *Burt,* Judge Seitz observed in *Agnellino,* the defendant's silence was essentially a form of conduct. The value as evidence lay in its implicit testimonial value. Nonaction rather than nonspeech was the subject of comment in *Burt.* In *Agnellino* there was no comparable nonaction. Judge Seitz said (493 F.2d at 728):

". . . Instead, Agnellino's silence would be the product of a conscious choice not to divulge information relevant to the crime with which we are concerned at the very time Agnellino was arrested and accused with commission of that crime. I do not believe that prosecutorial comment on such silence would be proper."

Judge Seitz explained that if the defendant chooses not to speak, he cannot be impeached with his silence. He said (*id.* at 729):

". . . The law has recognized that no testimonial statement may be drawn from silence in the face of police accusation, nor from a statement made under

duress, that is sufficiently reliable to be admitted for any purpose in a criminal trial."

Judge Seitz relied upon *United States ex rel. Smith v. Brierly,* 384 F.2d 992, 994 (3d Cir. 1967), which Judge Hunter distinguished as having peculiar facts. In *Brierly* the defendant, in the face of accusations about the murder for which he was arrested, clenched his fists and shook his head in consternation. The trial court found this action to constitute silence inconsistent with innocence. The Third Circuit said that normally this kind of action would constitute a denial rather than silence inconsistent with innocence. But the court stated that viewing it as silence, it would be inadmissible to impeach a defendant's trial testimony. The *Brierly* court quoted with approval *McCarthy v. United States,* 25 F.2d 298, 299 (6th Cir. 1928):

". . . to draw a derogatory inference from mere silence is to compel the respondent to testify; and the customary formula of warning should be changed, and the respondent should be told, 'If you say anything, it will be used against you; if you do not say anything, that will be used against you.'" 384 F.2d at 994.

Judge Seitz said that "[t]he law has recognized that no testimonial statement may be drawn from silence in the face of police accusation, nor from a statement made under duress, that is sufficiently reliable to be admitted for any purpose in a criminal trial." 493 F.2d at 729.

Judge Seitz concluded that Agnellino was *not* silent; he did give a statement to the police. Because that statement, that he

---

7. Judge Hunter found that silence after arrest even in the face of police accusations was close to the situation in *Raffel v. United States,* 271 U.S. 494, 46 S.Ct. 566, 70 L.Ed. 1054 (1926), where a defendant, who sat silently through his first trial in the face of damaging evidence produced against him, was impeached with that silence at his second trial where he did take the stand. The Court in *Raffel* reasoned that a defendant's silence in the face of damaging evidence is inconsistent with his exculpatory testimony at his retrial. Judge Hunter found *Grunewald v. United States,* 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957), where the

Court stated that a defendant's silence before the grand jury was not sufficiently inconsistent with his trial testimony to allow impeachment with his prior silence, to be distinguishable. *Raffel* was a situation where silence was genuinely inconsistent with exculpatory trial testimony, whereas silence before the grand jury was not. Judge Hunter stated that silence at arrest was closer to the *Raffel* situation than it was to the *Grunewald* situation. *See,* 493 F.2d at 719–21. It is interesting to note that both the *Hale* and *Doyle* decisions have expressly refused to overrule *Raffel.*

would not doubt if the goods had been stolen, was inconsistent with his trial testimony, which was that he had purchased the goods in the usual course of business, he could be impeached with it under *Harris.*

Judge Weis's concurrence in *Agnellino* also focused on the fact that there was no comment on the defendant's silence. The impeachment was of the defendant's credibility, which could be impeached with inconsistent statements, because once the defendant took the stand he waived his privilege of remaining silent.

In *United States v. Holland,* 360 F.Supp. 908 (E.D.Pa.1973), the court found that the prosecutor's comment and cross-examination of the defendant on his silence after arrest was error. However, the court found the error was harmless. The court stated that it believed that such cross-examination and comment burdened a defendant's Fifth Amendment privilege. The court distinguished *Burt* on the ground that in *Burt* the defendant's silence came in the face of an arrest for an unrelated crime. In *Holland* the defendant was silent in the face of accusations about the crime for which he was arrested. The court concluded (360 F.Supp. at 912):

> " . . . To conclude as we do that impeachment by silence in the face of criminal accusations deprives the defendant of his constitutional right against self-incrimination does not invoke an attempt either to regulate or to fail to regulate impermissible police conduct; it is merely an effort to give meaning to the Fifth Amendment right. And insofar as the Supreme Court has decided that the privilege to testify in one's own defense or not to so testify does not include the right to commit perjury, *we do not believe that that decision [Harris v. New York, supra] implicates the right to remain silent in the face of criminal accusations.*" (Emphasis added.)

The law in this Circuit, to say the least, is most confusing. If a trial court were to rely on *Burt,* it would be confronted with the fact that the per curiam opinion was not the majority. Which should the court follow? Judge McLaughlin's opinion, the per curiam, could be read to apply only to cases where the defendant's silence at arrest was in the face of questioning about an unrelated crime for which the defendant was then under arrest. It could also be restricted to cases where his silence was really nonaction. This is how Judge Seitz in *Agnellino* and the court in *Holland* viewed Judge McLaughlin's opinion.

Or a trial court could rely on Judge Rosenn's and Judge Van Dusen's opinions in *Burt,* which stated that even in the face of accusations about the crime for which the defendant was arrested he could be impeached with his silence. Similarly Judge Rosenn would not restrict the use of impeachment by silence to cases of nonaction. This was Judge Hunter's interpretation in *Agnellino.*

One could also rely on the opinions of Judge Seitz and Judge Weis in *Agnellino* which found that impeachment by silence is never permitted. *Accord, United States v. Holland, supra.* But both *Holland* and *Agnellino* involved comment rather than cross-examination. *Brierly* could also be used to support Judge Seitz' reasoning, or it could be limited to its facts as Judge Hunter did in *Agnellino.*

The law on this question was certainly unclear and reliance thereon could not have been great.[8] These cases represent the differing rationales and many challenges to the rule, which may *not* even have been the rule.[9] Therefore, I find no reliance factor strong enough to suggest nonretroactivity. In fact, the reliance factor indicates quite the opposite result.

Lastly, this Court must consider the burden on the administration of justice. Since the holding of this case must be read as

---

8. The *Hale* rule was foreshadowed in this Circuit in *Holland* and *Agnellino* and *Brierly.* On the Supreme Court level, the rule was foreshadowed by *Grunewald.*

9. The Supreme Court in *Hale* listed the Third Circuit opinion in *Burt* as the case representing this Circuit's position on the pre-*Hale* rule.

applying only to the factual situation now before the Court, only cases on direct appeal when *Hale* was decided will be influenced. Therefore, the number is not, this Court imagines, very large. Even if the rule were to apply to all cases, since there can be harmless error with regard to the *Hale* rule, the burden may not be so great. *United States v. Holland, supra,* 360 F.Supp. at 913. For example, there would not be the serious burden that the Court feared would result from applying the *Mapp* exclusionary rule. *Linkletter v. Walker, supra,* 381 U.S. at 638, 85 S.Ct. 1731.

■ The cases on retroactivity do not clearly set forth a means of measuring the burden, but have done so only on an ad hoc basis. The Court cannot conclude that any burden on the administration of justice can overcome the strong purpose and weak reliance factors in this case. The burden and reliance factors can only defeat retroactive application "when the purpose of the rule in question [does] not clearly favor either retroactivity or prospectivity." *Michigan v. Payne,* 412 U.S. 47, 55, 93 S.Ct. 1966, 1971, 36 L.Ed.2d 736 (1973). Since this is not the case, the Court must conclude that the *Hale-Doyle* rule must be applied retroactively. A fortiori, the *Hale* rule must be applied to cases pending on direct appeal when *Hale* was decided.

■ The Court must now turn to the second question directed to it by the Circuit, namely, does *Hale* require a new trial in this case. For the foregoing reasons, I conclude that it does.

Lenardo was indicted for conspiring to embezzle or steal or possess firearms stolen from interstate commerce as well as the same substantive crime and knowing possession of firearms stolen from interstate commerce.

At Lenardo's trial, James L. Scott, a codefendant, testified that he owed Lenardo money. Scott said that Lenardo had approached him about receiving some stolen merchandise for Lenardo from someone working at a railroad depot. That person also owed Lenardo money. Scott refused to do this, but after Lenardo made certain phone calls to Scott's family about the loan, Scott offered to give Lenardo his day's pay from the delivery of a shipment of goods as partial payment. Lenardo told Scott to remain where he was. When Lenardo arrived, he called his partner, Emil Pernetti, and then told Scott to take the truck to the National Parade Float Company in Hoboken. Scott was told to back the trailer into the building where Lenardo and Jaime Vega, the owner of the building, and some "Puerto Rican youths" partially unloaded the cartons of Mossberg guns from the truck. *See,* Trial Transcript, (hereinafter T.T.), 33–38.

Two days later, on August 22, 1973, F.B.I. agents made a consent search of the National Parade Float Company. They found 176 Mossberg rifles and shotguns concealed on the premises. T.T. 77–79. The serial numbers on the guns corresponded with those on the guns stolen from the truck Scott was driving. T.T. 119–121.

On the same day, agents Kelley and Cottone with four other F.B.I. agents arrested the defendant as he was parking his taxicab into the bus terminal stop at 5:10 p. m. in the height of the rush hour. Hearing Transcript (hereinafter H.T.) 20:2–5.[10] The agents searched the trunk of the taxicab and found seven pieces of cardboard bearing Mossberg markings and labels, five Mossberg packing lists, and a Ludlow rust inhibitor. One piece of cardboard contained two serial numbers which matched two serial numbers on one of the recovered stolen firearms. All of the stolen firearms recovered from the National Parade Float Company contained a Ludlow rust inhibitor. T.T. 122–125.

Agent Cottone testified at the hearing that he gave Lenardo his *Miranda* warnings as he escorted him to the agent's car. H.T.

---

**10.** Hearing Transcript, page 20, lines 2 to 5. with the Third Circuit's order. On remand the Court held a hearing to comply

20:20–23. He was told the crime of which he was suspected. H.T. 5:7. Agent Cottone said at the hearing that Lenardo was again given his rights in the car. H.T. 21:8–13. The officer added, "[a]nd his only reply was that he didn't want to make a statement until he had a chance to talk to an attorney." H.T. 21:11–13. Agents Kelley and De Bellis came over to Lenardo and showed him the Mossberg markings on the cartons and asked, "What are these cartons?" Lenardo did not answer. H.T. 21:23–25. He did not state that he was innocent; he just said that he wanted to remain silent. H.T. 21:25 to 22:1; 22:4–6. Lenardo said he wanted to consult a lawyer. H.T. 22:16–23.

At his trial, Lenardo offered an alibi defense. He said he was working that evening in a bar, and called four witnesses to support his alibi. Defendant's testimony was that on August 22, the day of his arrest, he drove Vega from the National Parade Float Company to a location near Kennedy Boulevard. Vega had three or four cartons with him, which Lenardo put in the trunk of the taxicab. Vega and the defendant unloaded the cartons. Vega asked Lenardo to wait for about ten minutes while he went into the house. Vega returned with four cartons which he asked defendant to dispose of for him. Lenardo placed the cartons in the trunk. On cross-examination defendant was asked why he had not offered this exculpatory explanation to the arresting F.B.I. agents, or why he had not mentioned it at his arraignment, or bail hearing, or even to his attorney initially. Defendant testified that he feared that if he told the agents, they might try to switch the date of the crime so as to defeat his alibi.[11] The United States Attorney again inquired why he had not offered this exculpatory explanation instead of remaining silent.[12]

11. "Q. Did you tell that to the FBI?
A. I didn't feel I had to.
Q. You had been arrested, hadn't you?
A. Yes, I was.
Q. You had to put money up for bail, didn't you?
A. Yes, I did.
Q. And you were being prosecuted for this crime, weren't you?
A. Yes, I was.
Q. And you didn't feel it was important to tell anybody that you had been framed?
A. *Because I was afraid if I told you, you might turn around, and, like, say a different date, something like that.* That's what I was told by different people."
[T.T. 268:14 to 269:2]

12. "Q. And when the FBI arrested you, and told you that they arrested you because of the stuff they took out of your car, you didn't tell the FBI, 'That's not mine, a passenger left it'?
A. When I was arrested there was five or six FBI agents came running at me.
Q. These men arrested you. The question is: Did you tell them that those boxes were not yours?
A. No, I did not.
Q. Did you say anything to them at any time after that, that those boxes were not yours, that they were a fare's?
A. *They wouldn't say anything to me, so I felt I shouldn't say anything to them about it.*
Q. They arrested you, they put you in cuffs, took you to jail, left you there two days, and you—
A. Not two days.
Q. For a day.

A. One day.
Q. —and you came to a bail hearing, and in none of that time—and at the bail hearing bail was set for you, is that right?
A. Yes, it was.
Q. —and at none of that time did you ever say, 'The things you found in my trunk aren't mine, they are somebody else's?'
A. No, I did not.
Q. You never told anybody that?
A. I never told the FBI that.
Q. You never told any of the authorities that?
A. No, I don't think I did.
Q. It didn't seem important to you?
A. It was the first time I had ever been arrested in my life, for anything. I felt that my lawyer—I had to get a lawyer—I would let him do it, because I cannot—I felt I wasn't capable of handling this myself.
Q. Mr. Lenardo, you are the same Mr. Lenardo who was *convicted of counterfeiting* in this court just a couple of days ago, aren't you?
A. I wasn't convicted, I pleaded guilty, because I was guilty.
Q. That's a conviction.
A. I pleaded guilty, though. I wasn't brought before a jury. I pleaded guilty because I was guilty.
Q. You are the same Mr. Lenardo who did that?
A. Definitely.
Q. But in this case where you have boxes in the car, a man was arresting you, you were certain you were innocent, you didn't say, 'These aren't mine'?
A. No, I did not.

The United States Attorney inquired of defendant's alibi witnesses, John Ralph Spano (T.T. 173:23 to 174:14), Alfred Steinheimer (T.T. 215:2 to 217:13), and Vincent Nisler (T.T. 237 to 238:16) why they had not told the F.B.I. or anyone else of the defendant's whereabouts on August 20. In summation he again raised this question (T.T. 328; 334:13–22).[13]

These facts certainly indicate that the prosecution used Lenardo's silence at arrest after receiving *Miranda* warnings to impeach his trial testimony. Lenardo made it clear that he wanted to speak to an attorney. In the context of this situation, his silence followed from the warnings he received. There was no silence inconsistent with innocence.

Nor does the fact that the defendant was arrested at the height of rush hour as opposed to Hale's arrest, which occurred in less public and more coercive circumstances, distinguish the situation. True, Hale had fled the police after being identified by an eyewitness, and he might have known the strength of the Government's case. But Lenardo knew that the cartons incriminated him. He may not have known how strong the Government's case was, but he did appreciate the seriousness of his situation. The fact that Hale had had many brushes with the law whereas Lenardo was arrested for the first time is not an important distinction. There is no indication that the Supreme Court wanted to hold *Hale* to its facts, especially in light of *Doyle*.

The purpose of the *Hale* rule would be no less served by application to the facts here than they were in *Hale* itself. When a person is confronted with five F.B.I. agents who accuse him of crime, take him under

Q. I see. And when Mr. Scott came to you and said, 'Gee, Mr. Vega is trying to frame you, trying to say that you were the guy who stole this stuff,' you never said to anybody at the bail hearing, or at motions, or at arraignment, you never said to anybody, 'This is a frame-up, you have got the wrong guy,' you never said that?
A. No, I never did. And like I say, I wasn't going to talk until I came to trial.
Q. I see. And when we had the bail hearing, you heard me argue that there were eleven guns still missing, that these were dangerous guns on the street, didn't you?
A. You said there was a hundred guns missing.
Q. I see. And you heard me say that, didn't you?
A. Yes, I did.
Q. And you knew that was important in how high your bail was going to be, didn't you?
A. I didn't do anything wrong. I felt you were the one saying it, and I didn't have to say anything. I am innocent until proven guilty.
Q. Didn't you want to tell the judge, 'Mr. Vega is wrong. The boxes in the car aren't mine. You didn't find any guns and somebody is trying to frame me'?
A. Number 1, I didn't know if there was any guns, I didn't know how many guns were missing, so I didn't have anything to say about that.
Q. But you knew the boxes weren't yours.
A. Definitely.
Q. But you didn't tell that to the judge?
A. No, I did not.
Q. I see. And you didn't tell it to your lawyer?
A. I can't remember if I told that to my lawyer.

Q. You had very capable counsel, Mr. Abrams—it wasn't Mr. Caroselli at that time—isn't that right?
A. That's right.
Q. And Mr. Abrams was there, was he not?
A. Yes, he was.
Q. In fact, he argued very effectively to keep your bail down, did he not?
A. You must know better than I. That was my first time there.
Q. Yet he never said anything, the whole time you were there, about the boxes not belonging to you, and the fact that the Government had arrested you because you had evidence in the trunk; he never said anything to the judge, did he?
A. Was he supposed to? I don't know.
Q. I am asking you. Did you tell your lawyer that the boxes didn't belong to you?
A. If I told him—like I say, at the time—this is going back—I probably did, or didn't, I don't remember. But if I did tell him, I don't know, he has his reasons why he didn't tell you. And he didn't consult me, if I did tell him."
[T.T. 284:12 to 288:15]

13. "I ask you to consider this fabulous tale— the truck driver who took the cartons, these incriminating cartons. Never said anything to anybody for two years about the fact that these cartons were never his at all, that all they were were part of a fare, and the three witnesses who claimed they were the friends of this defendant, and who, for two years, never said a word to anybody, the fact that their friend, the defendant, could not have done this crime because he was with them the whole time."
[T.T. 334:13–22]

arrest, give him *Miranda* warnings, and show him incriminating evidence they have found in his possession, there is little doubt but that such a person may seek refuge in his Fifth Amendment privilege. This is true for first offenders as well as career lawbreakers.

■ The Government contends that defendant's failure to object should bar a finding of reversible error and compel him to show plain error. It is a general principle that where an objection would be futile, the court will not require one to be made to keep open the defendant's rights in case of a change in the law. *United States ex rel. O'Connor v. State of New Jersey,* 405 F.2d 632, 634 n. 2 (3d Cir. 1969), *cert. denied, sub nom. Yeager v. O'Connor,* 395 U.S. 923, 89 S.Ct. 1770, 23 L.Ed.2d 240 (1969).

■ Failure to object would have a bearing on this case if it were found that before *Hale* this Circuit did not permit impeachment with a defendant's silence at arrest. If *Holland's* interpretation of *Burt* is correct, then Lenardo's silence could not have been used against him, because he was questioned about the crime for which he was arrested. However, because of the state of confusion on the law, the Court cannot rely on *Holland's* interpretation.[14] Therefore, the Court will not penalize defendant for having failed to object.

■ Violations of *Hale* may be harmless error. *See, Minor v. Black,* 527 F.2d 1 (6th Cir. 1975); *Rothschild v. State of New York,* 525 F.2d 686, 687 (2d Cir. 1975); *United States v. Holland, supra,* 360 F.Supp. 908. However, in the present case the prosecutor made quite an issue of the defendant's silence. Here the defendant offered four alibi witnesses. The error

could hardly have been harmless.[15] The jury obviously chose to disbelieve defendant and his witnesses. It certainly cannot be said, in light of *Doyle,* that the error was harmless beyond a reasonable doubt. *Chapman v. State of California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *Minor v. Black, supra.*[16]

In *Hale* the Court did not need to, and therefore did not, reach the issue of the use of a defendant's silence before the magistrate at the arraignment or bail hearing. In light of its present findings, this Court will also not consider that question. The prosecution's reference on summation to the defendant's silence after arrest only served to underscore to the jury what was said on cross-examination.

■ The Court finds no error in the cross-examination of defendant's alibi witnesses as to their credibility and as to why they had not informed the prosecution of defendant's alibi. They certainly cannot claim the defendant's privilege, for only he can assert that. Nor do they have a validly exercisable privilege against self-incrimination which was infringed.

For the above reasons, this Court finds that a new trial is mandated in this case.

---

14. In fact, if the *Holland* interpretation is correct, then the Court would not have been required to reach the retroactivity question.

15. In light of these facts, the error may even have been plain error.

16. The Government also argues that defendant's counsel opened the door when he asked

agent Cottone on cross-examination what the defendant said when he was arrested. The Court does not find that there was any incompleteness in the evidence caused by that questioning. Nor was the Government's case disadvantaged thereby. Therefore, there was no need to permit the misuse of defendant's silence contrary to his Fifth Amendment privilege.